Julie A. Mersch, Esq.
Nevada Bar No. 004695
e-mail:  jam@merschlaw.com
701 S. 7th Street
Las Vegas, NV 89101
702-387-5868
702-387-0109 fax

Richard H. Friedman, Esq.
e-mail:  rfriedman@frwlaw.us
Friedman, Rubin & White
1126 Highland Avenue
Bremerton, Washington 98337
360-782-4300
360-782-4358 fax

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| G. CLINTON MERRICK, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CASE NO. CV-S-00731-JCM-RJJ |
| | ) |
| PAUL REVERE LIFE INSURANCE | ) |
| COMPANY, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR NEW TRIAL,
REMITTITUR OR REDUCTION OF PUNITIVE DAMAGES**

i

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................... 1

II. TRIAL SUMMARY ............................................................................................ 2

III. FACTS ........................................................................................................... 4

  A. The Evidence At Trial Established That Defendants Directed Highly
     Reprehensible Conduct At Plaintiff And That He Suffered Substantial Harm As A
     Result ..................................................................................................... 5

  B. Defendants Conduct Directed At Merrick Was Part Of A Broader Corporate
     Scheme Of Longstanding Duration ......................................................... 16

  C. The Evidence Established That Defendants Gained Hundreds Of Millions Of
     Dollars If Not More As A Result Of Their Corporate Plan Or Scheme ................ 24

  D. Substantial Punitive Damages Are Required Because Defendants Remain
     Unrepentant ......................................................................................... 28

  E. Defendants Refuse To Accept Responsibility For Their Misconduct And
     Attempted To Hide It From Discovery ................................................... 30

IV. LEGAL STANDARDS ...................................................................................... 32

  A. Review Of Punitive Damage Awards For Federal Constitutional Excessiveness 32

  B. Reprehensibility Analysis .................................................................... 35

    1.a.  The type of harm was not just economic ..................................... 35

    1.b.  Harm done for economic gain ...................................................... 37

    2.   Reckless disregard for health and safety of others ...................... 38

    3.   Financially vulnerable targets .................................................... 40

    4.   Repeated action ......................................................................... 41

    5.   Malice, trickery or deceit or mere accident ................................. 41

    6.   Other factors ............................................................................. 42

  C. Reprehensibility Conclusion ............................................................... 45

  D. Ratio ................................................................................................. 46

    1.   The Correct Ratios .................................................................... 46

    2.   Constitutional Analysis of Ratio ................................................. 49

    3.   Effect of Prior Payments and Regulatory Settlement Agreements ....... 52

    4.   Ratio Conclusion ....................................................................... 54

  D. Comparable Penalties ......................................................................... 55

  E. Nevada Law ....................................................................................... 55

  F. Other Matters .................................................................................... 57

1.    The Federal Maritime Law Decision In *Exxon Shipping Co. v. Baker*, Is Not Relevant To This Court's Constitutional Due Process Analysis Of A Verdict Rendered Under State Law ....................................................................... 57

    a.  *Exxon Shipping Co. v. Baker* does not limit punitive damages under constitutional review ...................................................................... 57

    b.  The Nevada legislature's specific exemption of insurance bad faith claims from legislatively enacted punitive damage caps, and the Nevada Supreme Court's prior approval of punitive damages approaching a 30:1 ratio as compared to compensatory damages suggests that the Nevada Supreme Court would not adopt *Exxon Shipping Corp. v. Baker's* 1:1 ratio in maritime cases for insurance bad faith cases ............................................................. 59

V.    CONCLUSION ................................................................................... 60

# TABLE OF AUTHORITIES

**CASES**

*Ace v. Aetna Life Ins. Co*, 139 F.3d 1241 (9th Cir. 1998) ........................................... 4, 39

*Ainsworth v. Combined Ins. Co.*, 763 P.2d 673 (Nev. 1988) ............................ 35, 36, 60

*Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949 (Nev. 1999) .................. 35, 48, 56, 60

*Bains  LLC v. Arco Products Co,* 405 F.3d 764 (9th Cir. 2005) ......................... 37, 44, 50

*Bell v. Clackamas County,* 341 F.3d 858 (9th Cir. 2003)................................................ 47

*BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996)  .... 32, 34, 35, 36, 42, 47, 49, 55, 56

*Bongiovi v. Sullivan,* 138 P.3d 433, 452 (Nev. 2006) ..................................................... 55

*Burriesci v. Paul Revere Life Ins. Co.,* 255 A.2d 993 (N.Y.Sup.Ct.App.Div. 1998)........ 26

*Ceimo v. General American Life Ins. Co.,* 37 Fed.Appx. 968 (2005)............................ 44

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424 (2001).......... 4, 33

*Day v. Woodworth*, 13 How. 363, 14 L.Ed. 181 (1852) ................................................. 47

*Egan v. Mutual of Omaha Life Ins. Co.*, 598 P.2d 452, *modified on rehearing*, 622 P.2d 141 (Cal. 1979)..................................................................................................... 11, 40

*Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605 (2008) 1, 33, 34, 37, 40, 51, 56, 57, 58, 59, 60

*Greenberg v. Paul Revere Life ins. Co.,* 91 Fed.Appx. 539 (9th Cir. 2004) ................... 44

*Hangarter v. Provident Life and Accident Ins. Co.,* 373 F.3d 998 (9th Cir. 2004)... 36, 39, 40, 44, 54

*In re Exxon Valdez*, 490 F.3d 1066 (9th Cir. 2007) ... 1, 33, 34, 35, 36, 38, 39, 46, 49, 50, 51, 55

*Ingalls v. Paul Revere Ins. Group*, 561 N.W.2d 273 (N.D. 1997) ................................. 10

*Leatherman Tool Group, Inc. v. Cooper Indus.*, 285 F.3d 1146 (9th Cir. 2002) .............. 1

*Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003) ............................ 56

*Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007 (9th Cir. 2007) ......................... 5, 45

*Norcia v. Equitable Life Assurance Society of the United States,* 80 F.Supp.2d 1047

(D.Ariz. 2000) ........................................................................................... 8, 26

*Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 22 (1991) ............................... 56

*Philip Morris, U.S.A. v. Williams,* ___ U.S. ___, 127 S.Ct. 1057 (2007) ......................... 2

*Planned Parenthood v. Am. Coalition of Life Activists,* 422 F.3d 949 (9th Cir. 2005) .... 1,

47, 49

*State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U.S. 408 (2003) ..... 32, 33, 34,

39, 42, 45, 46, 47, 52, 55, 56, 58, 60

*State Farm Mutual Automobile Ins. Co. v. Campbell,* 98 P.3d 409 (Utah 2004) .... 36, 49,

52

*Union Oil Co. of California v. Terrible Hurst, Inc.,* 331 F.3d 735 (9th Cir. 2003) .............. 4

*Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020 (9th Cir. 2003) ................. 37, 50

*Zimmerman v. Direct Federal Credit Union,* 262 F.3d 70 (1st Cir. 2001) ....................... 35

**STATUTES**

28 U.S.C. § 1961 ........................................................................................................ 1

NRS 42.005 ....................................................................................................... 33, 59

NRS 42.007 ....................................................................................................... 33, 59

**OTHER AUTHORITIES**

Woody Guthrie, *Ballad of Pretty Boy Floyd* (1939) ........................................................ 27

**TREATISES**

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11 FEDERAL PRACTICE &

PROCEDURE CIV. 2d (2008) ....................................................................................... 33

v

**I.      INTRODUCTION**

After requesting, obtaining, and pursuing a new trial on punitive damages, the second jury assessed UnumProvident and Paul Revere with $36 million and $24 million, respectively, in punitive damages.  Although Plaintiff agrees that Ninth Circuit case law requires that the award against UnumProvident be reduced to a punitive/compensatory ratio of 9:1, no further reduction in the awards is required or warranted.  Awards in this range comport with due process.[1]

Contrary to their suggestion, Defendants have no due process right to have the awards reduced further.  Decisively, when reducing a constitutionally excessive punitive damages award, a reviewing court should remove any constitutional "excess," but not reduce the jury's punitive award below the largest amount due process considerations permit – the so-called "constitutional maximum."[2]  As for where the constitutional maximum lies, the Ninth Circuit has developed a "rough framework" for this analysis.[3]  In a case like this "with significant economic damages and 'more egregious behavior'" the Ninth Circuit's framework teaches that an appropriate "ratio would be above 4 to 1."[4]

As for where "above 4 to 1," *id.*, the maximum ratio lies, the reprehensibility of the Defendants' conduct – the most important consideration – favors an award at the high

_____

[1] As explained below, the denominator should include potential harm in the form of the additional benefits paid since the first verdict, and also reflect the value of the harm as of the second verdict.  The prior judgment totaled $2,216,743.23 and accrued interest (compounded annually per 28 U.S.C. § 1961(a)) at 3.3%.  Adjusting the value of the first judgment to the date of the second verdict thus brings the judgment total to $2,445,952.71.  The potential harm Defendants sought to gain also includes the additional benefits totaling $486,799.00 paid since the judgment.  Thus, the total potential harm equals $2,932,751.71.

[2] See *Leatherman Tool Group, Inc. v. Cooper Indus.*, 285 F.3d 1146, 1151 (9th Cir. 2002) (explaining the analysis a court should use when reducing a constitutionally excessive award).

[3] See *Planned Parenthood v. Am. Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1912 (2006).

[4] *In re Exxon Valdez*, 490 F.3d 1066, 1093 (9th Cir. 2007), *reversed on other grounds sub nom, Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605 (2008).

end  of the constitutional spectrum.  Other considerations, detailed further below, confirm this conclusion.

**II.   TRIAL SUMMARY**

On June 25, 2008, the jury in this case decided that clear and convincing evidence supported the award of punitive damages against each of the Defendants as a result of their bad faith termination of Plaintiff's disability insurance benefits.  The jury was instructed that it could return punitive damages as to each defendant only if Plaintiff proved the individual Defendant's liability therefore by clear and convincing evidence.[5] Based on the evidence introduced in this second trial, the entitlement to punitive damages was proven by clear and convincing evidence.

In deciding the amount of the award, the jury heard and considered evidence relating to the reprehensibility of Defendants' conduct.  Much of this evidence was new, not having been produced by Defendants or available to Plaintiff prior to the first trial in December 2004.  The jury was specifically instructed as to what conduct it could punish. In accordance with *Philip Morris, U.S.A. v. Williams*,[6] the jury was specifically instructed that it could directly punish a defendant only for the conduct which it directed towards Plaintiff and was instructed that it could not award amounts to punish Defendants for harm caused to persons other than Plaintiff.[7]

The jury was also specifically instructed how to assess reprehensibility, and other factors to consider in determining the amount of punitive damages necessary to punish and deter.[8]  The jury was told of the amounts Mr. Merrick had received in prior compensation, that he had been fully compensated.  It was also told it could consider those amounts in deciding both whether punitive damages were appropriate, and if so,

---

[5] Document No. 506 at Instructions 10, 11, 13.

[6] ___ U.S. ___, 127 S.Ct. 1057, 1064, 1065 (2007).

[7] Document No. 506 at Instruction 15.

[8] *Id.* at Instructions 9, 14, 15.

the amount needed to punish and deter.[9]   The jury was told of the purpose of punitive

damages and that such damages were not to be awarded as additional compensation.[10]

Finally, the jury was also told that it was not required to return punitive damages at all,

that it had to treat Defendants fairly, that it had to exercise its judgment without

sympathy, bias, passion, or prejudice, with calm discretion and sound reason, and that

punitive damages were to be awarded only if necessary, after consideration of all the

evidence, as further sanctions to achieve the goals of punishment and deterrence.[11]

At the conclusion of the evidence, and after being instructed as described above,

the jury returned separate verdicts as to each Defendant.  Against Paul Revere Life

Insurance Company, the jury determined that an award of $24,000,000 in punitive

damages was appropriate.  As against, UnumProvident, the jury determined that an

award of $36,000,000 was appropriate.

Defendants do not identify any instructional, evidentiary, or other error by this

that Court requires a new trial.  Defendants do not claim that the jury's awards are the

result of passion or prejudice.  Defendants' sole claim is that the jury's awards are

constitutionally excessive.[12]

Were Defendants challenging the sufficiency of the evidence supporting the jury

awards, the question before the Court would be whether its verdicts are "against the

great weight of the evidence, or whether it is quite clear that the jury has reached a

---

[9] *Id.* at Instructions 12, 14, 18, 19.

[10] *Id.* at Instructions 14, 18, 19.

[11] *Id.* at Instructions 1, 8, 13, 14, 18, 19, 20.

[12] Based largely on their constitutional excessiveness arguments, Defendants also argue that the verdicts are excessive under Nevada law.  For reasons discussed in §§ IV.E-F, these arguments should be rejected.

1    seriously erroneous result."[13]  Defendants do not so contend, and if they did, the

2    extensive factual discussion contained in § III would refute such an argument.

3         In determining whether the jury's verdicts are constitutionally excessive, the

4    Court must independently assess the evidence to determine if the facts support the

5    award.  With respect to whether it sustains or remits, the Court should make its own

6    findings of fact, particularly with respect to reprehensibility, in order to assist appellate

7    court *de novo* review.[14]

8    **III.   FACTS**

9         In this punitive damage trial there was substantial evidence of Defendants'

10   repeated misconduct directed against Mr. Merrick in an effort to terminate and defeat

11   reinstatement of his own occupation individual disability benefits.  The evidence

12   established that Merrick was in fact disabled, that Defendants terminated his claim in

13   bad faith, and that as result of their bad faith conduct Plaintiff suffered substantial harm

14   both economic and emotional.

15        There was also overwhelming evidence of how Defendants' conduct directed

16   towards Merrick was not an isolated incident, but, rather, was part of a corporate

17   scheme to terminate or deny claims in order to meet corporate financial goals at the

18   expense of disabled policyholders.

19       The evidence further established that Defendants gained hundreds of millions of

20   dollars—if not more—as a result of their corporate scheme.  The evidence established

21   that Defendants sought to conceal their misconduct through claims of privilege and

22   through the destruction of documents, conduct which was evidenced in this case, both

23

24

25

26   [13] *Ace v. Aetna*, 139 F.3d 1241, 1248 (9th Cir. 1998) (citations and internal quotations omitted); *Union Oil Co. of California v. Terrible Hurst, Inc.*, 331 F.3d 735, 742 (9th Cir.

27   2003), *cert. denied*, __ U.S. __, 124 S.Ct. 1060 (2004).

28   [14] *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 440 n. 14 (2001).

directly and through circumstantial evidence.[15]  Even after Defendants were found liable for bad faith and breach of contract, they continued to deny having done anything wrong either with respect to Merrick's claim itself, or with respect to their corporate claims handling culture.  Throughout trial, Defendants' claims concerning their behavior, both towards Merrick and towards their disabled policyholders at large, were discredited. Defendants remain unrepentant and refuse to accept responsibility for their misconduct.

> **A.    The Evidence at Trial Established that Defendants Directed Highly Reprehensible Conduct at Plaintiff and that He Suffered Substantial Harm as a Result**

At the trial of this matter, the following facts were established either by instruction or by evidence adduced at trial.  These facts showed that Defendants directed highly reprehensible conduct at Plaintiff.

- Plaintiff purchased a non-cancellable, guaranteed renewable, own occupation, disability insurance policy from Defendant Paul Revere Life Insurance Company in 1989.

- Under the terms of the policy Merrick was entitled to benefits, if, due to illness or injury, he was unable to perform the material and substantial duties of his occupation.  The policy does not require the existence of a particular injury or illness or even any diagnosis.  If disabled from his occupation under the policy Merrick was entitled to benefits of $12,000 per month for as long as his disability lasted or until age 65, whichever came first.  Merrick's policy was one of the "Cadillac" policies that disability insurers had sold in the 1980's and 1990's to doctors, lawyers, and other professionals.

---

[15] *See Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007 at 1014-1015 (9th Cir. 2007) (affirming sanctions order based on failure to produce documents ordered produced over claims of privilege); *see also* § III.B discussing evidence that circumstantially supports the proposition that Merrick's claim was roundtabled during the period when he sought to have his benefits reinstated.

- The evidence at trial established that the Cadillac policies, such as Merrick's were not actuarially sound, were marketed over aggressively, and were poorly underwritten.  Ex. 22.

- The evidence at trial established that these policies were a financial train wreck for the disability insurance industry.  Faced with mounting losses many insurers left the market.  Defendant Provident Companies, Inc., what became UnumProvident, and Paul Revere were two of the market survivors.

- At the time Merrick purchased the policy he was a successful businessman. Merrick had worked his way through college graduating *cum laude* from the University of Tulsa.  After graduating from college he enrolled in the Stanford MBA program.  During the time he was in that program he worked for General Mills.  After graduating from the Stanford program Merrick went to work for General Foods ultimately becoming a vice-president of marketing and sales. After working for General Foods Merrick became the CEO of Mueller Pasta the largest pasta manufacturer in the United States.  He successfully led a management buy out of the company when First Boston purchased it for $425 million.

- Merrick's experience with the Mueller Pasta buy-out led him to become a partner in a venture capital firm.  The firm specialized in consumer products.  Among the more successful investments the firm made that Merrick was responsible for was Boston Beer Company, the producer of Sam Adams beer.

- At all times relevant to this lawsuit, and the claims asserted herein, Merrick's occupation was that of a venture capitalist.  Such an occupation required long hours of work, substantial work related travel, and the ability to read, comprehend, evaluate, and explain, complex financial documents rapidly.  As a venture capitalist Merrick had multiple responsibilities.  These included raising funds to manage, evaluating potential business ventures for investment purposes, investing and monitoring investments, and working with the companies

that the venture capital firm was invested on both an operational and strategic levels to position them to go public.  It is through the process of public offerings that much of the profit in venture capital is attained.

- Beginning in 1991 Merrick began suffering from a low grade illness.  It affected his work performance.  As his work abilities suffered Merrick began negotiating with his partners to leave the venture capital firm.  Not surprisingly, given the complexity of the business and the financial stakes involved, it took some time to reach an agreement.  In 1994 a separation agreement was completed.  At the end of July, 1994 Merrick wrote to Paul Revere putting it on notice of claim.  He told it, initially, that he was still trying to obtain a definitive diagnosis and that when he did so he would provide more information.

- Revere received Merrick's notice in early August, 1994.  Though no claim was yet filed, Defendant Revere was required to post a reserve, known as an incurred but not reported reserve, IBNR.

- Given that Merrick's benefits under his policy were $12,000 per month, that Merrick was fifty-one years old when he provided notice of claim, and that if totally disabled he would be entitled to benefits until age 65, the IBNR reserve was substantial.

- Between, June of 1994 and February, 1995 Merrick continued to seek a definitive diagnosis and treatment for his illness and in December 1994 he was diagnosed with Chronic Fatigue Syndrome at the Mayo Clinic following a series of physical, psychiatric, and neuropsychological testing.

- During the time that Merrick was seeking to obtain a definitive diagnosis and treatment, Defendant Revere repeatedly sought information on whether Merrick intended to file a formal claim for benefits.  While Defendants sought to characterize this evidence as attempts to be of service to Merrick, another interpretation is more likely – if Merrick told Revere that he was not filing a claim,

the IBNR could be released, and money that Revere had to reserve to pay Merrick's claim could be removed from its liabilities and added to its assets.

- Ultimately Merrick filed all the claim forms required of him and Revere, recognizing that Merrick could no longer perform the material and substantial duties of his occupation as a venture capitalist, put him on claim without a reservation of rights.

- In deciding to put Merrick on claim, Revere first considered whether it could reclassify Merrick's occupation as that of an unemployed person.  Ex. 174 at 186. If so, it would have denied his claim, on the basis that he was capable performing the material and substantial duties of an unemployed person, *e.g.*, activities of daily living.[16]  Two of Defendants' witnesses, Ms. Bostek and Mr. DiLisio attempted to justify the unemployed-as-an-occupation analysis, but the Court need not credit their explanations.  Ms. Bostek admitted that if Revere had been able to assert that Merrick, despite his years of employment as a venture capitalist, was unemployed at the time disability arose, it would have denied the claim.  Mr. DiLisio, attempted to justify the unemployed as an occupation tactic as a means to extend benefits.  His explanation was so qualified and convoluted it was not credible.

- Merrick remained on claim.  Internal evaluations of his claim by Revere's medical personnel concurred in his treating physicians' conclusions that Merrick was substantially impaired.

- While Merrick had previously had a large income and benefits from his occupation as a venture capitalist such income did not insulate him from financial stress.  Money that had been saved for other purposes was used to meet regular

---

[16] One court has described these Defendants' conduct in classifying individuals' occupations as unemployed as "'pure poppycock' utterly bereft either of textual support in the language of the insurance contract or the gloss placed on such language by any Arizona [the relevant jurisdiction] case."  *Norcia v. Equitable Life Assurance Society of the United States,* 80 F.Supp.2d 1047, 1053 (D.Ariz. 2000).

expenses.  In addition to his immediate family, Merrick was providing support for his aged father, who was essentially indigent and his adult daughter who had terminal breast cancer.  Merrick, along with others, was also providing support to Young Mee Jeon, who would eventually become his wife after his divorce.  At the time she was attending a seminary.[17]

- As a result of his illness and consequent loss of income, Merrick was attempting to scale back his expenses.  His family began the process of selling his house in Connecticut.

- On August 2, 1995, through its field investigator Michael Kunkin, Revere offered Merrick four months of benefits if he would give up his claim.  If he had accepted the offer Merrick would have relinquished over $1.5 million in benefits.  At the conclusion of the visit, Kunkin left Merrick a check for $12,000 representing one month of benefits with an endorsement on the back constituting an agreement that some kind of settlement had been reached regarding all liability under the claim. (Ex. 174 at 222.)

- Defendants attempted to characterize this settlement offer as a "return to work benefit."  No credible evidence suggests this was the case.  Revere had not established that Merrick could go back to work as a venture capitalist.  It had not identified any venture capitalist position that Merrick could work in with reduced stress and on a part-time basis as recommended by his treating physicians.  Defendants further admitted that they had not offered Merrick any rehabilitation assistance or services.

---

[17] Defendants assert Merrick was engaged in a cross-country affair with Young Mee Merrick prior to his divorce.  That assertion was unsupported by any evidence at the second trial.  Merrick testified without dispute that he and his current wife only became intimate after he was divorced, a divorce initiated by his ex-wife.

- At this first meeting where the field investigator offered the claim settlement, he left Merrick with the impression that if he did not take it, the company might sue him for the benefits it had previously paid.

- Further supporting the view that Revere was engaged in a low-ball settlement attempt is found in corporate documents.  According to the Provident/Paul Revere Transition Plan, Ex. 113, field settlements of greater than three months of benefits were to be made only in turn for a signed release, meaning a completely final payment.[18]  Exhibit 44, a memo by a former Revere employee Christopher Kinback, established that during this time period Revere was using its field employees as claim closers.[19]

- The Court can therefore conclude, as did Merrick, that Revere, in fact, was attempting to obtain a settlement based on a low ball offer and threat to engage in litigation.

---

[18] Ex. 113 at 303:

> [W]e recommend allowing Field Claim Representatives up to six months in benefits, to be used at their discretion for settlements.  In general, however, settlements greater than three months would be expected to be in exchange of a signed release.  Otherwise, it must be questioned whether or not this advanced payment makes sense in terms of being a completely final payment.  Advance payments for the sake of closure only, with a significant expectation of reopening, would not be proper.

[19] Kinback wrote:

> Field Claim Reps can have an immediate positive impact on claim results.  During the implementation of the Paul Revere takeover of the Equitable's block of business, the first step we took was to immediately have our 3 local Field Claim Representatives handling some files.  Since Equitable had no field force to speak of , the immediate impact was encouraging.  As the process evolved and cases were distributed to our field force nation wide, we noted that over 50% of all cases referred were being closed.  These numbers served to increase the overall average of cases closed by field claim reps in all other lines to 40% which was an all time-high.

That Revere's methods of closing claims through its field representatives included threats of litigation if insureds refused to compromise their claims is reflected in *Ingalls v. Paul Revere Ins. Group*, 561 N.W.2d 273, 282 (N.D. 1997).

- After the unsuccessful attempt at claim settlement, as part of its claim investigation Revere had Merrick attend a neurologic IME in November 1995. That neurologist, Dr. Donaldson also concluded that Merrick was substantially impaired, though he disagreed with the diagnosis from Merrick's treating physicians that Merrick suffered from Chronic Fatigue Syndrome.  While Revere claimed there were some questions raised as to Dr. Donaldson's opinion regarding the extent of Merrick's impairment, Revere never sought to clarify its concerns.

- In January 1996, Revere changed position with respect to Merrick's claim. Where previously it had accepted liability without reservation, it now asserted a reservation of rights, based on Dr. Donaldson's IME which, though it disagreed on diagnosis, agreed that Merrick was substantially impaired.  By paying under reservation Revere substantially impacted Merrick's peace of mind because he no longer felt assured of his monthly finances.  Similarly, the threat of litigation substantially eroded the "peace of mind" that disability insurers know they are selling when they market their products.[20]

- In April, 1996 the acquisition of Revere by Provident Companies, Inc., was announced.  The transaction would be completed in March, 1997.  Then, in 1999, Provident Companies, Inc. became defendant UnumProvident when it merged with Unum Corporation.

- In July 1996 Provident was reporting it had begun the transition process to an integrated claims operation with Revere in June 1996.  Ex. 104.

- In October 1996, as part of the integration of Revere and Provident, Provident held a training session with Revere's field claim personnel to begin training them in "best practices."  Ex. 114.  Provident had previously begun using "claim objectification as part of its claims operations."  Ex. 34.  As revealed in both

---

[20] *See, e.g., Egan v. Mutual of Omaha Life Ins. Co.*, 598 P.2d 452, 456, *modified on rehearing*, 622 P.2d 141 (Cal. 1979).

Merrick's claim file, and in the larger institutional case, Ex. 235, 325, 326, 327, claim objectification became a means the Defendants used to impose a requirement on their insured's for claim payment that was not part of the insurance policy sold.  Further Defendants used the process of "objectification" to shift the burden of claim investigation to their disabled insureds, including Merrick.

- In November 1996, all the medical evidence in the file supported the fact that Merrick was disabled from his own occupation.  Defendant's in-house evaluators concurred with Merrick's doctors on the issue of impairment, though they disagreed on diagnosis.  Defendants' in-house evaluators knew that the lack of objective test results was not definitive with respect to whether Merrick suffered from chronic fatigue syndrome.  They knew that neuropsychological testing could not be used to diagnose the disorder.  Ex. 174 at 343.  *See also*, Ex. 348.[21]

- In November 1996, after the Provident training, Revere's investigator, Kunkin, returned to Merrick's house in Connecticut.  Merrick's son had recently died, a fact the company was aware of.  Ex. 174 at 486-488.

- Despite the uniformity of opinion that Merrick was in fact disabled, in November 1996, after receiving Provident's training on claim objectification, Kunkin, as

---

[21] Confirming the information in the file that neuropsychological testing could not be relied upon as a basis to deny the claim, this November 1997 internal memo authored by Defendants states in relevant part:

On November 7, 1997 the following people met to discuss our handling the FMS and CFS claims. …

Our goal was to discuss these two illnesses, evaluate where we are in handling them and develop and action plan to move forward.

Basically we have acknowledged the credibility of these diagnoses based on considerable research by high profile organizations.  … We realize that there are no clinical tests to objectify the diagnosis of CFS and FMS yet there are board certified physicians certifying to partial and total disability.  We know there is no cure, no true treatments and no objective way to refute the diagnosis.

directed represented to Merrick that all of the medical reviewers had determined that he was not disabled.  Ex. 174 at 512.  Kunkin offered Merrick two months of benefits in exchange for Merrick's agreement not to pursue further benefits.  Ex. 174 at 508, 510.  Kunkin told Merrick that if he did not accept this offer the company might sue him for benefits it had previously paid.  When Merrick rejected this offer, Defendants terminated his claim.

- Along with the financial stress, the death of Merrick's son made him particularly vulnerable to harm caused by Defendants when they terminated his benefits.  It would be hard to conceive of a more vulnerable individual than a disabled parent, who had recently suffered the death of a child.

- Once again Merrick rejected Defendants' low-ball offer.  Ex. 174 at 512-513, 518-521.

- At the time of the second field visit by Kunkin in November, 2006, Merrick's claim was targeted for closure on a rush basis.  Ex. 174 at 508.  Defendants had no legitimate basis to terminate Merrick's claim in November, 1996.  Closing his claim at that point served only Defendants' financial interest in removing a substantial liability from their books as they approached the year end, thus making it more likely that they would meet their net termination ratio and financial goals for that quarter.

- In November 1996 Revere closed Merrick's claim supporting its denial on the basis of a lack of objective evidence, though such was not a requirement of the policy and despite its knowledge that CFS could not be diagnosed or measured through such testing.  Ex. 174 at 343, 525, Ex. 348.

- After Revere terminated Merrick's benefits, he attempted on repeated occasions to get his claim paid.

- Merrick specifically asked Defendants what testing they would consider sufficient to support the claim.  Ex. 174 at 542-543.  Defendants refused to provide Merrick with that information.  *Id.*  They concealed from Merrick what they in fact knew—

that there was no objective testing to measure the impairment or establish the diagnosis.

- Each time Merrick submitted new information in support of his claim Defendants rejected it.  On each occasion they asserted that the absence of objective medical evidence precluded claim payment.  Ex. 174 at 539, 611.

- Defendants' knew that Merrick's illness could not be established by objective evidence, but repeatedly insisted he produce such evidence, when their contract did not permit them to do so.  Ex. 174 at 518, 525, 539, 536, 611.

- Defendants, shifted the burden of investigation to their insured, refusing to assist him in getting his claim paid, despite their obligation to do so.

- Merrick persisted in attempting to get his claim paid without litigation until April 2000.

- From completion of the merger in March, 1997 on, all of the claim handling on Merrick's claim, including the repeated refusals to pay the claim in the face of his attempts to get it paid was done by Provident Companies, Inc. and its successor defendant UnumProvident.  Under a 1998 General Services Agreement, Provident Companies, Inc. took over all the responsibility for handling Revere's claims.  Ex. 146.  Even before the merger was completed, however, the evidence established that Revere's claim handling practices were being influenced by Provident.  *See, e.g.,* Ex. 114, Ex. 120, Ex. 122, Ex. 154.

- At the first trial the jury determined that each Defendant had breached the insurance contract.  This finding was affirmed on appeal.

- At the first trial the jury determined that each Defendant had not had a reasonable basis to terminate Merrick's benefits or had otherwise acted unreasonably in connection with the claim.  This finding was affirmed on appeal.

- At the first trial the jury determined that each Defendants unreasonable claims handling behavior had been engaged in knowingly or recklessly. This finding was affirmed on appeal.

14

- At the first trial the jury determined that each Defendant had acted in bad faith. This finding was affirmed on appeal.
- At the first trial the jury determined that each Defendant had acted with oppression, fraud or malice.  This finding was affirmed on appeal.
- At the first trial the jury determined that Merrick suffered emotional distress as a result of Defendants' bad faith conduct and compensated him in the amount of $500,000 for which Defendants were jointly and severally liable.
- At the first trial the jury determined that Defendants breach of contract had deprived Merrick of $1,147,355 in contract benefits.
- After the first trial Defendants started paying Merrick contract benefits, again subject to a reservation of rights.
- As a measure of damage for loss of use and delay for accrued damages, Defendants paid prejudgment interest of $550,173.69.
- Defendants' paid recoverable costs of $19,214.54.
- Defendants' paid $171,646.66 in post-judgment interest on the compensatory damages.
- Under the post-trial reservation of rights Defendants paid Merrick an additional $486,799 in contract benefits.
- The total actual and potential loss to Merrick as a result of Defendants' bad faith conduct, including liability for breach of contract in terms of money paid by Defendants was $2,875,186.89.  When the first judgment is brought current to the date of verdict in the second trial, it had a present value of $2,445,952.71. Combined with the post-first-trial benefits, the total harm actual and expected to Merrick as of the date of the second verdict was $2,932,751.71.

While the conduct directed at Merrick identified above, would alone support substantial punitive damages against each of the Defendants under the pertinent analysis, the evidence at trial in fact established that this conduct was part and parcel of a broader corporate scheme to obtain financial gain at the expense of Defendants'

disabled policyholders.  This corporate scheme is addressed in the next section.  This evidence warrants a finding that Defendants should be punished at or near the highest level constitutionally permitted.

**B.    Defendants Conduct Directed at Merrick Was Part of a Broader Corporate Scheme of Longstanding Duration**

At trial Plaintiff contended that the misconduct Defendants directed at him was the result of a corporate plan or scheme engaged in for financial gain.  While Defendants attempted to deny the existence of this scheme, the evidence they offered was not credible in light of the overwhelming evidence that the scheme existed and was applied to Merrick.  Some of that evidence is set forth in this section.

- Early in the 1990's Defendant Provident realized that the claims made on the own occupation insurance policies that it sold were putting the company at risk. Ex. 22.

- As a consequence the company underwent a major restructuring of its claim handling practices and philosophy.  Provident went from a company that had a claim payment philosophy to one that had a claims "management" philosophy. The results were profound.

- Among the tactics that Provident developed as part of its new claims management approach was the targeting of what it labeled "subjective claims." These were claims based on mental or nervous disorders or claims such as fibromyalgia or CFS.  These claims which could not be proven by hard medical evidence such as an x-ray were thought to contain a large potential for resolution based on the vulnerability of insured's to pressure tactics.  Ex. 44, Ex. 113 at 331.

- Another of the tactics that Provident brought was its practice of claim objectification.  Through its practice of imposing objective evidence requirements on its insureds, when its policies contained no such standard, Provident sought to defeat their claims.  This standard was imposed even on claims, like Merrick's,

where the company knew there was no way to obtain objective evidence.  Ex. 174; Ex. 235; Ex. 326; Ex. 327; Ex. 348.

- A third tactic that Provident developed was its use of round table reviews.  These reviews which involved claim personnel, medical staff, vocational staff, legal counsel, and management personnel focused on high indemnity claims.  Ex. 99.  While notes were occasionally made of what direction the claim should take after a round table review, company policy was to destroy all information regarding who participated in the meetings, what was discussed, and the basis for any decision.  Ex. 113 at 108; Ex. 325, Ex. 326, 327.  Defendants' also attempted to cloak the round tables with the attorney-client privilege in order to further insulate the actual claims decisions and basis therefore from review.  Ex. 99, Ex. 6.

- Provident's round table process, like the process of objectification was brought to Revere.  Ex. 270.  Even before the merger was completed in March 1997, the process of objectification training and use of round tables had begun.  Ex. 268, Ex. 270, Ex. 120, Ex. 122.

- It is reasonable to conclude that Merrick's claim was subjected to a round table which was not documented.  Merrick's claim involved a high indemnity own occupation policy.  Merrick's claim involved a "subjective disability."  While Merrick's claim was not new when the round tables were brought to Revere, it was closed and he was seeking to have it reopened by providing additional information.  Under Defendants' "Best Practices Recommendations" which were implemented with the Provident/Revere merger there is every reason to believe that Merrick's claim was "roundtabled."  Ex. 113 at 262.

- A fourth tactic that was developed was the Defendants' practice of shifting the burden of claims investigation to the insured.  Ex. 235; Ex. 325, 326, 327.  It was undisputed that it is an insurer's duty to conduct a reasonable investigation into all available relevant information prior to denying a claim.  It was undisputed that an insurer must conduct a reasonable and fair evaluation of the evidence in a

non-adversarial fashion.  It was undisputed that an insurer may not deny or terminate a claim based on speculation.  It was undisputed that an insurer may not use biased or predictable experts.  It was undisputed that insurers have a duty to assist the insured with the claim.  Ex. 218.  Despite the existence of these undisputed obligations that exist in the handling of first party claims, the evidence established that Defendants instructed their employees that it was the insured's obligation to prove his claim.  Ex. 229.  Employees were instructed to limit their use of independent medical examinations.  *Id.*  They were told that IMEs were not to be used unless absolutely necessary.  *Id.*  Though Defendants initially denied it, on cross-examination Defendants admitted that they in fact rated the "quality" of the IME reports that they received.

- The limitation on the use of IMEs to gather information was part and parcel of another practice—that of overvaluing the opinions of in-house medical personnel who never examined the insured over the opinions of either treating physicians or IME doctors.  Ex. 235.  As set out below, Defendants engaged in that conduct in Merrick's case.

- Similarly, Defendants in-house medical personnel engaged in cherry picking records to find grounds for denying claims regardless of actual merit.  Ex. 235, 325.  Documentary evidence established that in-house medical personnel "focus upon any apparent inconsistencies in the medical records or other information supplied by claimants, rather than attempt to derive a thorough understanding of the claimant's medical condition."  Ex. 235.  Defendants engaged in such conduct with respect to Merrick.

- The evidence established that Defendants had a practice of piecemealing claimants' medical conditions and did not consider the totality of the medical circumstances.  Ex. 235, Ex. 325.  As discussed below, Defendants did that in Merrick's case.

- Defendants set targets and goals for claim terminations to obtain financial gain and without respect to claim merit. Ex. 325, Ex. 326, Ex. 327. Defendants' denied the existence of such targets and goals but the evidence at trial on this point was overwhelming. The testimonial and documentary evidence
  - o Established the existence of targets and goals to close terminate claims. Testimony of Stephen Rutledge; Testimony of Stephen Prater;
  - o Established the existence of net termination ratio targets on a corporate basis, Ex. 1, 5, 46, 68, 111, 115, 116, 124, 135, 141, 144;[22]
  - o Established the existence of financial targets for closing claims on a corporate basis, Ex. 49, 52, 95;
  - o Established that those corporate goals were transmitted to claim handling units which felt the "reserve pressure," Ex. 68, 268;
  - o Established that claim handling units were requested to obtain certain amounts in claim closures or recoveries, Ex. 239, Ex. 242;
  - o Established that when units were not able to make their goal on a weekly basis that they were required to develop written action plans to bring their closures in line with the goals that were set. Ex. 232;[23]

---

[22] Defendants claimed, and there was evidence that not all terminations are the result of improper denials. That is undoubtedly true. Individuals do get better and return to work. Policyholders' benefits expire. Policyholders age out so that benefits are no longer payable. And, policyholders die. But, the evidence also established that the Defendants set targets and goals beyond their actuarial expectations for claim closures based on these factors. The evidence established that Defendants went looking for ways and claims to close in order to meet their financial goals.

[23] The Worcester Resolution Consistency Strategy stated in part:

> Each Impairment Units will be evaluated weekly to determine if recovery momentum is more less concentrated than expected, based on historical month-end recovery averages. Units that are less concentrated than expected will be charged with the task of developing a written, detailed Action Plan designed to identify causes for the slower than expected momentum and outline activities that will be initiated to bring momentum back in line with expectations. These Action Plans will be developed and reviewed with me within 24 hours of release of the Monthly Trends report.

○   Established that these targets and goals were communicated to claim handling employees by such means as e-mails, and weekly Staff Meetings.  Ex. 261,[24] Ex. 260,[25] Ex. 259,[26]  Ex. 262, Ex. 232;[27]

---

This exercise is designed to achieve greater accountability at all management levels for consistent results week to week.

Furthermore, additional emphasis will be provided at each of my weekly Staff Meetings, as well as at each Impairment Head Staff Meeting, not only around forecasting (and forecasting methodology) but also around current trends and focus on improved momentum as necessary.

[24]   Beingness" is the state in which you are ever present in whatever activity you are engaged in; IE absorbed in what you are currently doing. That is better than being recoveryless….

Dated June 10, 2002 6:28 AM

[25] This e-mail is entitled "YIPPEEEEEE!!!."  It states in part:

We had yet another excellent week. …

No Reopens…. Month to date

***

We are already at $608,000 in recoveries well ahead of schedule.

We are still lagging with projections so we need to add more to the projection list.

Also, we don't have any rtw success stories on the board yet.

Overall, we are cranking…. Thank you!!!!!

Dated June 10, 2202, 9:47 AM (emphasis in original) "Recoveries" is a term synonymous with "claim closures."

[26] An e-mail which reflects the pressure being put on claim personnel to find claims to close states:

Folks:

As luck would have it, we are running out of it. …

We are projected to have 1,800,000.00 in recoveries this month but are coming up short at 1,772,000.00… this includes the following that I would like updates on today:

***

**Are there any other claims that are possible recoveries this week????**

    o  Established that to further pressure and give incentive to claims personnel to find reasons to terminate claims, stock boards were set up in the claims units and updated throughout the day so that claim personnel could see how their activities were contributing to the UnumProvident's financial results.  Ex. 232;[28] and

    o  Established that the corporate plan and scheme permeated the company and was known to and endorsed at the highest levels when the head of claims reported to the Board of Directors.  Ex. 281.[29]

---

Dated June 25, 2002 8:55 AM (emphasis in original).

[27] *See* note 23.

[28]  The document entitled "Worcester Employee Morale Improvement Strategy" contained within Exhibit 232 states:

> UnumProvident stock boards will be erected on all Customer Care Center floors.  The stock price will be updated periodically throughout the day by an administrative assistant.  The stock boards will serve to raise awareness of corporate performance levels and build a greater sense of pride among the staff for Worcester's contributions to the corporation's performance.

Encouraging claim handling employees to evaluate their performance based on their contribution to corporate stock price further supports the conclusion that Defendants were turning their claims handling operation into a profit center.  This, despite the undisputed evidence, that it would be inappropriate to use the claims operation in such a manner.  Ex. 218.  Further, not only were employees encouraged to consider their performance based on stock price, employees were actually made stock holders in the company.  Ex. 188 at MERG 0111, 0166.  The use of stock boards in claim units contributed to a corporate culture which elevated the financial interest of the Defendants and employees over that of claim making policyholders.

[29]  This March 29, 2000 Board of Director Meeting Minute states:

> Mr. Mohney discussed the customer care organization.  He introduced Mr. Arnold who he noted would be taking over the management of the Portland Customer Care Center.  He described metrics for measuring performance.  Improvements reflecting the implementation of the model previously used in Chattanooga and Worcester, in the Portland, Chicago and Glendale customer centers were described.  Mr. Mohney noted that they were seeing aggregate improvement and he was confident of the ability to meet the plan level previously proposed., although they were somewhat behind plan at this point. … Members of the Board questioned

- That conduct directed towards Merrick was part of this corporate scheme is evidenced in a variety of ways including:

  o Attempting to classify Merrick's occupation as "unemployed" in an effort to deny him benefits.  Ex. 174 at 186; Ex. 347.

  o Asserting a reservation of rights on claim payments without a basis for doing so.  Ex. 174 at 279, Ex. 325 at 19, Ex. 326 at 12; Ex. 327 at 5.

  o Twice attempting to force Merrick into accepting a low ball offer of settlement in turn for a complete release of his claim or face the possibility of being sued for benefits previously paid.  Ex. 174 at 279; Ex. 325 at 12, 19; Ex. 326 at 12, Ex. 327 at 5.

  o Disregarding or cherry-picking inconsistencies in medical records to create a pretext for claim termination, despite the uniformity of opinion from treating physicians and evaluators that Merrick was substantially impaired. Ex. 174 at 70, 153, 174**;** Ex. 235 at 10-11; Ex. 327 at 2.

  o Not considering Merrick's condition or medical records as a whole, as reflected in Defendants' selective reliance on portions of the Mayo Clinic's evaluation of Merrick while ignoring the overall conclusion which was that Merrick in fact had Chronic Fatigue Syndrome;

  o Misrepresenting to Merrick that Defendants' own in-house evaluators had determined that he was not substantially impaired, when, in fact, they concluded he was.  Ex. 174 at 518-519, 522-525; Ex. 326 at 12, Ex. 327 at 3.

---

the effect of the timing of improvements in the claims management process on reserves.  Mr. Greving stated that the objectives were achievable and that the Company could incrementally strengthen. Although this could have an effect on earning, he did not see any problem with respect to reserves in the next year.  Mr. Mohney stated his belief that the goals were achievable and that the same process consistently applied should create similar results that would support the target.

- o  Telling Merrick that his claim had to be denied because it was not supported by objective evidence when there was no such requirement for claim payment in the policy and Defendants' knew that objective testing was not likely to show impairment.  Ex. 174 at 343, 525, 536, 539, 611; Ex. 235 at 8; Ex. 326 at 9; Ex. 327 at 3; Ex. 348.

- o  Closing Merrick's claim on a rush basis in order to meet quarter end financial goals, though Defendants had no evidence within their possession to support such a claims decision on the merits.  Ex. 174 at 508; Ex. 326 at 11; Ex. 327 at 3.

- o  Telling Merrick that he was not disabled under the policy from his own occupation despite not having conducted any sort of investigation to establish that the occupation of venture capitalist could be performed on a part time basis in a low stress environment.

- o  Shifting the burden of claim investigation to Merrick to come up with evidence satisfactory to Defendants and then refusing to provide him any assistance with respect to carrying that improperly imposed evidentiary burden.  Ex. 174 at 519, Ex. 235 at 8, Ex. 326 at 11; Ex. 327 at 5.

- o  Requiring Merrick to file suit, incur attorney fees and costs, and to go through litigation in order to obtain the benefits to which he was entitled. Ex. 326 at 12; Ex. 327 at 5.

Defendants claim in their memorandum that, "Generalized evidence about corporate practices is insufficient to demonstrate repeat misconduct unless it involves conduct 'similar to that which harmed the plaintiff.'"[30] While that may be true as a legal proposition, the evidence recounted above clearly, convincingly, credibly and overwhelmingly establishes that Merrick's claim was handled in accordance with

---

[30] Document 514 at 11:15-17 (Defendants' Memorandum at 6:15-17).

widespread corporate policies designed and implemented to obtain financial gain at the expense of disabled insureds.  No other conclusion is warranted.

### C.    The Evidence Established that Defendants Gained Hundreds of Millions of Dollars if Not More as a Result of Their Corporate Plan or Scheme

The evidence at trial established that Defendants' engaged in a corporate plan or scheme to defraud thousands of their disabled insureds out of hundreds of millions of dollars over a period of nearly 15 years from 1994 to the present.  That Defendants engaged in such conduct for financial gain is beyond question.  That they did so at the expense of their disabled policy holders is also beyond question.  Evidence introduced at trial suggests the extraordinary improper financial gains Defendants obtained through their institutionalized bad faith claim handling practices.

- An in house analysis authored by Provident's head of risk management in 1994 concluded that the company's non-cancellable own occupation policies substantially impaired its financial capabilities.[31]

- In response to the financial crises Provident redesigned its claim process.  It recognized that such redesign carried with it "tremendous leverage."  Ex. 33.

- Among the areas recognized as creating large financial opportunities were psychiatric claims and field investigators.  Ex. 44.  As reported in that document[32] Revere was using its field investigators to close claims.  Defendants were encouraged that by changing their claim handling practices they could achieve

---

[31] Exhibit 22:

> The disability operation continues to generate large statutory losses since no special reserve was recorded on the statutory side jeopardizing the company's ratings and financial flexibility.  Further, the existence of the special reserve on the block of business written prior to 1994 creates a huge drag on the company's reported ROE.  Over $300 million of capital stands behind the special reserve block of business and essentially all earnings other than the return on capital and surplus have been zeroed out.

[32] *See* note 19 *supra*.

24

substantial savings.  Ex. 45.  Chronic fatigue claims were sent to the psychiatric claims unit for intense handling.  Ex. 75.

- As the Company completed its analysis, it recognized that changing its claim practices, could have a large payout.  Initial estimates suggested that the company could save between $30 and $60 million annually.  Ex. 46.  Adjusters were directed to make top ten lists of claims where "intensive effort will lead to successful resolution of the claim."  Ex. 61.

- It soon became obvious, that the Company had wildly underestimated the financial gain it could achieve by changing from a claim payment to a claim management mode.  Ex. 54, Ex. 59, Ex. 69, Ex. 73, Ex. 77, Ex. 80,[33] Ex. 87, Ex. 95, Ex. 102, Ex. 104, Ex. 106, Ex. 108, Ex. 111,[34] Ex. 115, Ex. 116[35]

- The Company began setting financial goals for terminations that were well above what it had traditionally been able to achieve.  E.g., Ex. 52 (setting second quarter goal for terminations of $132 million dollars, 10% above the prior year's average).

- Ultimately Provident Companies, Inc. went from a company with little financial flexibility to a company with over $8 billion dollars in total stockholder equity.  Ex. 342 at 29.

- Revere in turn accumulated a surplus of over $1 billion in 2007 after declaring stock and cash dividends of approximately $1 billion. Ex. 341 at 96, 118.

---

[33] In a January 1996 Memo Ralph Mohney wrote to Tom Heys:

Overall, we are both pleased and encouraged with the results of the claim management activities during the quarter.  The $114.8 million of net terminations (terminations minus reopens) represents a record level and is 28 % ahead of the previous four quarter average.  Moreover, the fourth quarter represents the 3rd consecutive quarter of $100 million or more in net terminations.

[34] Reporting a reduction of reserves of $121 million over the prior year.

[35] Reporting an annual net resolution ratio of 98%, 14% more than what had been earlier set as a goal.  Ex. 116.

- Other evidence suggests that much of this accumulation in value came at the expense of Defendants' policyholders.
  - Under the limited claim reassessment process required by the Multistate Market Conduct Examination settlement process, Defendants were required to make claim payments and post additional reserves of approximately $676.2 million dollars.  Ex. 612.
  - These additional reserves and claim payments represented money owed to a fraction of the claimants whose claims had been denied between 1997 and 2005 and who elected to participate in the claim reassessment process required by the Multistate settlement.  Ex. 612.  Out of over 290,903 claimants that the Defendants mailed notices to, only 78,422 opted in.  Of that number only 23,190 completed the complex forms necessary to have their claims reassessed.[36]  Of that number, the Defendants reversed position on 41.7% of the claims.
  - While Defendants would suggest that those who did not participate in the reassessment were satisfied with the initial claim handling, no credible evidence supports such a conclusion.  It is equally or more likely that some individuals did not participate because 1) they did not receive notice; 2) they died; 3) their trust in the company had been so abused they chose

---

[36] Exhibit 350.  For example, the form asks the participating claimant to provide detailed information about the policy number, claim number, a detailed explanation about why the insured believed their claim had been mishandled (a difficult task at best in the absence of detailed knowledge concerning claim handling practices, standards, and these defendants perversion of the same, lengthy detailed employment history, lengthy detailed medical form, other benefit information (without revealing that if the insured had sought unemployment benefits the company might take the position that they were not disabled because their occupation was unemployed), Ex. 174 at 186, Ex. 347, *See, e.g., Norcia v. Paul Revere Life Ins. Co., supra* note 13; *accord Burriesci v. Paul Revere Life Ins. Co.,* 255 A.2d 993, 679 N.Y.S.2d 778 (Sup.Ct.App.Div. 1998) (defendant engaged in bad faith by classifying insured's occupation as unemployed while injured while out of work and on unemployment).

not to participate; 4) that the forms were so complex or required the provision of information the insured did not have so that they were unable to complete them; 5) they did not have the basis to know whether their claim had been improperly denied or terminated,[37] and/or 6) they did not want to give up legal rights they might have as required if they obtained benefits under the reassessment process.

- o Further supporting the conclusion that many of the non-reassessed claims would have resulted in additional payments (and not reassessed remain as improperly obtained financial gain) is the fact that approximately 42% of the reassessed claims resulted in additional payment.  Ex. 612.

- Other evidence also suggests that the amount of newly made payments and posted reserves understates the Defendants financial gain by a substantial degree.  Exhibit 95 established that during the first quarter of 1996 as part of its scheme Defendants was reporting quarterly terminations of $147.2 million "up 15.1 million (11.4%) from the previous four quarter average."  It goes on to note that these quarterly results "demonstrates that the investments in claim effectiveness over the last eighteen months are beginning to pay substantial dividends."  Exhibit 52 showed Defendants with a target of $132 million in quarterly claim terminations.  Exhibits 239, 242, 259 demonstrate that the Defendants were seeking millions of dollars in claim terminations from individual claim units month after month.  Such is reflected as well in the monthly unit reports introduced into evidence with which demonstrate the pressure to achieve high net termination ratios, *see, e.g.,* Ex. 137, 141, 144, 331,[38] 333,[39] and

---

[37] "Yes, as through this world I've wandered I've seen lots of funny men; some will rob you with a six-gun, and some with a fountain pen."  Woody Guthrie, *Ballad of Pretty Boy Floyd* (1939).

[38] Reporting Worcester's September 1999 Net Resolution Ratio in Reserves for individual disability claims of 108.6% and reporting it as an improvement over July and

millions of dollars of terminations through the roundtable process Ex. 268, Ex. 270.

- Based on the credible testimony concerning targets and goals,[40] the documents and the duration of Defendants' misconduct there is every reason to conclude that Defendants gained well in excess of a billion dollars as a result of their claims handling misconduct.

### D. Substantial Punitive Damages Are Required Because Defendants Remain Unrepentant

In the prior trial of the case the jury found that each Defendant had breached the insurance contract in bad faith.  The jury found that each Defendant had acted with oppression, fraud or malice.  These findings were affirmed on appeal.  Despite these jury determinations and judicial findings at the retrial Defendants:

- Asserted that they had done nothing wrong in the handling of Merrick's claim;
- Repeatedly insinuated that Plaintiff was not disabled.

---

August of that year.  In the same document the Worcester claims operation reports an LTD net resolution ratio in reserves of 120.6%.

[39] Reporting on Worcester results and characterizing them as "unfortunate" because they were lower than average.  The document further addresses how Worcester will remedy such "unfortunate" results:

> We are committed to a continued focus on activity levels, action plans and roundtable reviews, which will improve our claim management effectiveness.  We will be using "min-roundtable" beginning in August as a form of follow-up on claims previously presented in roundtable, but which remain outstanding.

In light of Exhibits 333, 268, and 270, there can be little question, that the purpose of the roundtables continued to be a means to find a way to close claims, just as was their purpose at inception.  Ex. 69, 85, 99, 135.  No other interpretation of the Defendants' purpose or goal for the process is credible.

[40] Even Ms. Bostek admitted to having to meet expectations with respect to claim closures.  She testified in response to the "action plan" requirements reflected in Exhibit 232 that she had never had to prepare one because her units always met the expectations.

- Asserted that the company(s) had never done anything wrong in handling any claims.
  - Defendants claimed that insurance regulators had found that they had not engaged in any form of misconduct towards any insured.  This position was demonstrably wrong and Defendants knew it.  The evidence established that investigators found widespread misconduct in Defendants' claims handling and that Defendants chose to enter into settlement agreements with regulators in order to avoid the formal findings of the very misconduct that they denied.  The evidence also established that they entered into these settlements to avoid additional financial and regulatory repercussions from their misconduct.  Ex. 235; 286; 327.
  - Presented expert testimony concerning the regulatory process with respect to these Defendants' which was simply not credible for several reasons.  Defendants' regulatory expert, Mr. Poolman, had no first-hand knowledge of the regulatory process as applied to these Defendants.  Mr. Poolman admitted that he did not participate in the process, did not know what documents, if any, beyond claim files, that examiners had access to, admitted that he had not even read most of the documents Defendants provided to him, and was seemingly unaware of other regulatory actions taken against Defendants by both the State of California and the State of Georgia.  Even Mr. Poolman's testimony concerning the Multistate regulatory process and how it was settled, the testimony which he was retained to provide, lacked credibility.  Only a heavily biased or truly uninformed witness could conclude that Defendants were given a clean bill of health by regulators and that they had not systematically engaged in the denial of valid claims of their disabled insureds.
  - Put on testimony of a witness, Kristine Bostek, who testified as to the good practices at the company, but who also admitted to being less than

forthcoming in prior testimony, and who was less than forthcoming in her own testimony at trial as revealed by her denial of knowledge and impeachment over the *Columbo* award — an award Defendants gave to claim handling employees whose investigations led to the termination of claims.

o   Failed to present the testimony of a single current claims handling or management level employee who could testify as to current practices at the companies or could testify that any of the types of bad faith conduct evidenced in Merrick's claim file and in the institutional documents had changed.  This failure to call company witnesses is even more telling given that Defendants introduced two corporate representatives to the jury at the beginning of the case, including a claims vice president, and that both representatives were in attendance throughout the trial.

o   Moreover any suggestion that things are different at the company now was belied by evidence that certain regulatory settlements precluded Defendants from being cited for regulatory violations during the claim reassessment process, Ex. 346 at 24-25, and the fact that the high level management of Defendants which knew and participated in the institutional bad faith practices at Defendants remain in place.  For example Thomas Watjen, who was with Provident at the inception of Defendants' bad faith conduct, and who was the head of its finance investment and legal organization at the time of the merger with Revere, Ex. 188 at MERG 0047-48, was Vice-Chairman of Executive Management after the merger with Revere, *id.* at MERG 0096, remains as the CEO of Unum Group.  Ex. 342 at 20, See also, Ex. 286, 281, 188 at MERG 0089.

**E.   Defendants Refuse to Accept Responsibility for Their Misconduct and Attempted to Hide it from Discovery**

Just as Defendants remain unrepentant, the evidence at trial established that in seeking to avoid liability for punitive damages they were willing to manufacture a defense designed to hide their misconduct as well as establishing corporate practices to hide their misconduct on an ongoing basis.  The evidence which supports these conclusions includes:

- Presenting statistical claims about corporate practices based not on statistics generated in the regular course of business, but, rather, based on statistics generated at the request of their trial counsel.  O'Connell Testimony.
- Presenting false testimony that they were returning their claimants to work when they had no idea whether claimants who they classified as "return to work" actually had done so.  Testimony of Kathy Rutledge (rebuttal testimony).
- Claiming that a large number of resolutions were due to people returning to work or as a result of company rehabilitation efforts when the evidence revealed that at best, an insignificant portion of claimants benefited from Defendants' return to work/rehabilitation activities.  In many of the corporate documents admitted at trial dealing with claim resolutions, return to work/rehabilitation is not even mentioned.  Where mentioned and quantified, the statistics revealed it was of little import to the overall claim resolution process.
- Claiming that their corporate policies were the result of consultants that they had hired, when the evidence showed that they were already doing most of those things the consultants recommended.  Ex. 46.
- Having corporate policies designed to hide claim handling activities through claims of attorney client privilege; Ex.6; Ex. 99.
- Having corporate policies designed to hide claim handling activities by either not creating or destroying documents material to the claims handling process.  Ex. 113; Ex. 325 at 20; Ex. 326 at 11; Ex. 327 at 4.

As addressed in the following section, the appropriate legal analysis applicable to these facts suggests only one correct outcome to this case with respect to the level of

punitive damages.  The punitive damages against each Defendant should be substantial not nominal.  Further, the punitive damages neither constitutionally, nor as a matter of Nevada law are limited to a 1:1 ratio as compared to the compensatory damages.

## IV.   LEGAL STANDARDS

### A.   Review of Punitive Damage Awards for Federal Constitutional Excessiveness

In *BMW of North America, Inc. v. Gore*,[41] the Supreme Court set forth a three factor analysis for post-trial review of punitive damage awards to ensure that they were not constitutionally excessive.  The three primary factors which the Court held needed to be considered on a case-by-case basis were (1) the reprehensibility of the defendant's conduct, (2) the relationship between the actual and potential harm to the plaintiff and  the punitive damages awarded, and (3) a comparison between the punitive damage award and the possible common law and statutory penalties which were applicable to the conduct to ensure that the defendant had notice of what conduct was punishable and the potential degree of punishment.[42]

The Court addressed this three factor analysis again in *State Farm Mutual Automobile Ins. Co. v. Campbell*.[43]  In *Campbell* the Court reiterated that post-trial review needed to be done on an exacting case-by-case basis.[44]  *Campbell* further emphasized, the most important factor of the three identified in *BMW v. Gore*, was reprehensibility.[45]  The *Campbell* Court again considered the ratio factor and again rejected applying a bright line rule that punitive damages that exceeded compensatory

---

[41] 517 U.S. 559 (1996).

[42] *Id*. at 575-585.

[43] 538 U.S. 408 (2003).

[44] *Id*. at 418.

[45] *Id*. at: 419.

damages were constitutionally invalid.[46]  Finally, with respect to the third *BMW* factor, the Court in *Campbell* and subsequent Ninth Circuit decisions have held that it is the existence rather than size of penalties which is most important.[47]

In Nevada, the state legislature has clearly recognized that large punitive damage awards are necessary to punish and deter insurance bad faith.  In setting caps on punitive damages, the legislature specifically exempted insurance bad faith conduct within a small subset of claims for which caps would not apply.[48]

In conducting a review for constitutional excessiveness the Court's role is to determine the maximum amount of punitive damages that are constitutionally sustainable, and any remittitur should be to the constitutionally sustainable **maximum**, not to some other lower figure that the court in its own opinion might have imposed in the first instance.[49]

The *Campbell* Court's reprehensibility analysis focused on five factors:

whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated

---

[46] *Id.* at 424-425:

[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. We have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award.  We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.

(citations and internal quotations omitted).

[47] *Id.* at 428; *In re Exxon Valdez*, 490 F.3d 1066, 1094-95 (9th Cir. 2007), *reversed on other grounds*, *Exxon Shipping Co. v. Baker,* 554 U.S. ___, 128 S.Ct. 2605 (2008)

[48] NRS 42.005 (2)(b); NRS 42.007(2).

[49] *Cooper v. Leatherman Tool Co., Inc.* 285 F.3d 1146, 1151 (9th Cir. 2002); Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11 FEDERAL PRACTICE & PROCEDURE CIV. 2d §2815 (2008) (writing that remittitur to the constitutional maximum is the only procedure that complies with the Seventh Amendment)

incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.[50]

The Ninth Circuit has subsequently addressed the *Campbell* analysis on repeated occasions. With respect to Campbell's five factor reprehensibility analysis, it most comprehensively analyzed them in *In re Exxon Valdez*.[51] The Ninth Circuit's *Exxon* opinion thoroughly recounts the recent Supreme Court constitutional jurisprudence related to punitive damage assessment. As the Court correctly noted, on only two occasions has the Supreme Court struck down punitive damage awards as constitutionally excessive because of the disparity between the punitive award and the compensatory damages.[52] In *BMW v. Gore* the ratio was 500:1. In *State Farm v. Campbell*, the ratio was 145:1. Under any analysis, the ratio between the punitive damages returned by the jury in this case, and the harm and potential harm suffered by Merrick as measured by the prior judgment and the benefits paid under compulsion of the jury verdict does not approach these ratios. Were that the full extent of the analysis required, the Court could simply affirm the verdicts as entered. This is because, with respect to the verdict against Revere, the ratio between punitive damages and the harm and potential harm to Plaintiff is 8.18:1[53] With respect to the verdict against UnumProvident the ratio analysis reveals that the ratio between the punitive award and the actual and potential harm is 12.28:1.[54] As well as being an order of magnitude less than the unconstitutional awards in *BMW* and *Campbell*, these ratios are well within range of those approved by the Nevada Supreme Court in insurance bad faith cases

---

[50] 538 U.S. at 419.

[51] 490 F.3d 1066, 1083-1089 (9th Cir. 2007), *reversed on other grounds, Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605 (2008). As discussed *infra* at § IV.F, Defendants' reliance on the Supreme Court's decision in *Exxon Shipping* is misplaced because, as the Court took pains to explain, it was not rendering a decision based on a constitutional analysis.

[52] 490 F.3d at 1083.

[53] *See* § IV.C.1 and note 86 *infra*.

[54] *Id.* and note 87 *infra*.

involving less egregious conduct over a far shorter time than that established by the evidence in this case.[55]

The Ninth Circuit in *Exxon* also noted that the *BMW/Campbell* guideposts are just that, guideposts.  As it explained, "They need not be rigidly or exclusively applied, for we agree with our sister circuit that '[t]hese guideposts should not be taken as an analytical straight jacket.'"[56]

The Ninth Circuit then went on to analyze both its own prior case law applying *BMW/Campbell* and the facts of the Exxon Valdez grounding and litigation to arrive at its determination of the constitutional maximum in that particular case.  Its' analysis of the *BMW/Campbell* guideposts in its own case law, and as applied to the Exxon litigation suggests, that in this case, punitive damage awards significantly in excess of the harm and potential harm suffered by Plaintiff at the time Defendants terminated his benefits are both constitutionally permissible, and necessary to accomplish Nevada's state interest in punishing insurance bad faith conduct and deterring it by both these and other entities.

**B.  Reprehensibility Analysis**

**1.a.  The type of harm was not just economic**

Both the Supreme Court in *BMW* and the Ninth Circuit in *Exxon* and other cases have recognized that conduct which causes emotional as well as economic harm is

---

[55] *Ainsworth v. Combined Ins. Co.*, 763 P.2d 673, 674, 678 (Nev. 1988), *cert. denied,* 493 U.S. 958 (1989) (approving punitive award that was more than 28 times the compensatory damages); *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 1267-1269, 969 P.2d 949, 961-962 (Nev. 1999) (remitting punitive award to 13.6 time the compensatory damages from an amount that was 27.2 times in a case where the Defendants took corrective action after learning of the dispute including attempting to settle the claim by payment of all that was owed including attorney fees incurred and that very few individuals were affected by the insurers' conduct).

[56] 490 F.3d at 1083, *quoting Zimmerman v. Direct Federal Credit Union*, 262 F.3d 70, 81 (1st Cir. 2001).

35

more reprehensible than that which causes only economic harm.[57]  Here, Merrick was

found to have suffered $500,000 in emotional distress.  While there may have been

some concern in the first trial that figure contained a punitive component, no such worry

exists in this case because the jury was not asked to, and did not assess damages for

emotional distress.  Indeed it was told that Merrick had been fully compensated for such

harm and that it could consider such prior compensation in determining whether and to

what extent additional punishment and deterrence was needed.  Further, as recognized

by the Ninth Circuit in *Hangarter v. Provident Life and Accident Ins. Co.*,[58] where the

mental and emotional distress damages are only a fraction of the economic damages

awarded, as in this case, there is less reason to be concerned that the punitive award is

duplicative.

Insurers, particularly disability insurers well know that emotional distress from the

destruction of peace of mind is virtually certain to follow on the improper denial or

termination of benefits to their disabled insureds.  That fact is recognized in Nevada

law.[59]  With respect to Merrick, Revere improperly asserted a reservation of rights,

attempted to strong-arm Merrick into giving up his claim, and then repeated its effort at

doing so at a time when it knew he was emotionally vulnerable due to the death of his

teenaged son.  It terminated his benefits, falsely asserting that its evaluators had

determined that he was not impaired and falsely asserted that in order to have his claim

---

[57] *BMW v. Gore*, 517 U.S. at 576, n. 24; *In re Exxon Valdez*, 490 F.3d at 1085-86.  In *State Farm v. Campbell*, after remand the Utah Supreme Court finding that insurance bad faith and the emotional distress it causes is more akin to a physical assault than a pure economic tort remitted the punitive damages to a 9:1 ratio and the Supreme Court then denied *certiorari.  State Farm Mutual Automobile Ins. Co. v. Campbell*, 2004 UT 34, 98 P.3d 409, 415 (Utah 2004), *cert. denied*, __ U.S. __, 125 S.Ct. 114 (2004).

[58] 373 F.3d 998, 1015 n. 11 (9th Cir. 2004).

[59] *Ainsworth v. Combined Ins. Co.,* 763 P.2d at 673, 677 (health insurance):

> [I]nsurance is a special kind of commercial activity.  The insurer is under a duty to treat its policyholders fairly.  The obstinate unjustified refusal to pay a legitimate claim is offensive to society, precisely because the consumer pays for insurance to gain security and peace of mind.

paid he was required to provide objective evidence when it knew that no such evidence could be provided or was required.  Revere's conduct in this case is no less egregious than that of the defendants in *Bains LLC v. Arco Products Co.*, [60] and *Zhang v. American Gem Seafoods, Inc.*[61]  In addition, it was Revere that initially considered denying Merrick's claim on the basis of his alleged occupation as an "unemployed" individual, despite the lack of legal or contractual basis for such a denial.

With respect to UnumProvident, all of the above, except the unemployed person tactic, applies to it as well in the context of Merrick's claim.[62]  In addition it was UnumProvident that developed the misuse of claim objectification to deny legitimate claims and that repeatedly denied Merrick's claim after termination on the basis of no objective evidence, when it knew that none could be obtained or was required.  Further, it was UnumProvident that refused to provide Merrick assistance when he sought help from it with respect to what proof of disability it would find acceptable.  It was UnumProvident in the redesign of its claims process that recognized and sought to exploit the vulnerabilities of individuals like Merrick who had claims for which objective medical testing was limited or non-existent though the illnesses were nonetheless disabling.

### 1.b.    Harm done for economic gain

As the Supreme Court explicitly recognized in *Exxon Shipping Co. v. Baker*, "Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability." [63]  Nevada law itself recognizes this fact, particularly in the

---

[60] 405 F.3d 764 (9th Cir. 2005) (intentional repeated ethnic harassment which was not motivated by financial gain as was the conduct in this case, court approves punitive damages in a ratio range between 6:1 and 9:1)

[61] 339 F.3d 1020 (9th Cir. 2003) (court approves punitive damages in excess of 7:1 in employment discrimination retaliatory discharge case where compensatory damages in the amount of $360,000 were awarded).

[62] Exhibit 347 however establishes that UnumProvident also engaged in such tactics. Authored months after the merger was announced and integration of the two companies had begun, it denies the claim based on the assertion that the insured's occupation is that of an "unemployed person."

[63] 554 U.S. at ___, 128 S.Ct. 2622.

context of insurance bad faith where powerful financial motivators exist for insurers to elevate their interests above their insured's. Under Nevada's punitive damage regime, insurance bad faith is one of a limited set of claims which the legislature specifically exempted from specific punitive damage dollar and ratio limits. The statutory exception represents a judgment by the legislature that insurance bad faith is the type of conduct that involves "enhanced degrees of punishable culpability."

In short, and as detailed in §§ III.A – C, Defendants' conduct in this case demonstrates the type of conduct deliberately engaged in to augment profit that the both the Supreme Court and Nevada have recognized as representing an enhanced degree of culpability. Rather than militating against a lower level of punitive damages, the type of conduct engaged in by Defendants in this case militates in favor of a higher award.

### 2.    Reckless disregard for health and safety of others

The Ninth Circuit's *Exxon* decision on this Campbell factor also militates in favor of enhanced reprehensibility. There, the court considered the danger to the crew and rescuers though they were not plaintiff's in the litigation.[64] It held that such consideration was appropriate under reprehensibility analysis. Further, as in *Exxon*, what is at issue in this case is not just conduct directed towards this specific plaintiff, but rather conduct engaged in as a matter of corporate policy which underlies this punitive damage litigation. This conduct was directed at over 200,000 of Defendants' policyholders, Ex. 612. At the time that Provident began its institutionalized practices it had over 600,000 policyholders who were at risk of being subjected to its bad faith practices. Ex. 22. Revere was also a large carrier. With the merger, the combined entity became the largest disability insurer in the country. Ex. 188 at MERG 0022, 0094. It is fair to say that hundreds of thousands of individuals were put at risk.

---

[64] 490 F.3d 1086-1087.

Considering the *Campbell* issue of dissimilar act evidence as applied to this factor, the

Ninth Circuit in Exxon wrote:

> The prohibition in *State Farm* against considering dissimilar acts does not apply here because taking into account the potential harm to the crew and rescuers punishes Exxon for the same conduct that harmed the plaintiffs. We have made this point before. See, for example, *Hangarter v. Provident Life and Accident Insurance Co.,* 373 F.3d 998, 1015 n. 11 (9th Cir.2004), where we analyzed company-wide policies in a single-plaintiff lawsuit and distinguished *State Farm*'s warning against considering dissimilar acts. We said "unlike in *State Farm,* a legally sufficient nexus existed between Defendant's allegedly widespread corporate policies and the termination of [the plaintiff's] benefits." *Id.*

> Accordingly, where the same conduct risked harm to all, the risk to all can be considered as a factor in assessing reprehensibility.[65]

It is not hyperbole to state that the wrongful denial of insurance benefits,

particularly disability insurance benefits, risks the health and safety of insureds.[66]  This

---

[65] 490 F.3d at 1087.

[66] *Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1246 (9th Cir. 1998):

> Harbour's cover letter explained Ace's fragile physical, emotional and economic position and advised Aetna that unless it accepted Ace's application by Mary 1, Ace would file suit.  By February 1993, Ace had been forced to sell much of her personal property and her home.  She sent he eldest son to live with another family and she lived in her car from late February through early April.

*Hangarter v. Paul Revere Life Ins. Co.*, 236 F.Supp.2d 1069, 1096-1097 (N.D. Cal. 2002), *affirmed in part, reversed in part* 373 F.3d 998 (9th Cir. 2004):

> Plaintiff testified at trial about her humiliation at being forced along with her children onto welfare, after having been a professional with her own practice. (Tr. 487:24-489:4, 492:3-25, 497:17-21). She also testified that she was concerned about her life and so anxious that her doctor prescribed anti-anxiety medication. One night she went to the hospital thinking she was having a heart attack, which turned out to be an anxiety attack. (Tr. 489:10-491:2). She attributed her anxiety to Defendants' having terminated her benefits. (Tr. 489:10) She was evicted from her house for nonpayment of rent and began to feel like a "bag lady." (Tr. 493:10-15) She testified that she wouldn't have had to go on welfare, declare bankruptcy, or be evicted if she had still been receiving her disability benefits from Defendants. (Tr. 494:10-18)

is true as well in this case given that Defendants' terminated Merrick's benefits at a time when he was emotionally vulnerable due to the death of his son.  Defendants' corporate conduct directed at others risked their health and safety.  Defendants' conduct directed particularly at Merrick put the health and safety of their emotionally vulnerable insured at risk.  This factor too, counsels in favor of finding Defendants' conduct highly reprehensible.

### 3.    Financially vulnerable targets

The *Exxon* court held that "where the same conduct risked harm to all, the risk to all can be considered as a factor in assessing reprehensibility."  As the facts discussed in § III make abundantly clear, Defendants targeted not only their individual own occupation non-cancellable disability policy owners, and those policies that had high monthly indemnities, but also those particular policyholders who made claims  based on diagnoses such as chronic fatigue syndrome.  Merrick therefore fell within three targeted groups.

Merrick was not left indigent.  But he did suffer financial stress.  As a result of his disability he had left his occupation and was forced to scale back his standard of living.  Faced with the denial of benefits, he reached into savings and investments for which he had other purposes, to meet current obligations such as supporting his own father, his terminally ill daughter, and to aid in the support, along with others, of Young Mee Jeong, who would later become his wife.

With limited exception,[67] no specifics are known of the thousands of others who were subjected to the same practices that Merrick was.  Yet, the very purpose of disability insurance is to provide income when an individual is financially vulnerable because of disability.[68]  The only conclusion to be drawn is that Defendants in fact targeted the financially vulnerable, their own disabled insureds.  It is difficult to conceive of any more reprehensible conduct.

---

[67] *See, e.g., Hangarter v. Paul Revere Life Ins. Co., supra* note 66.

[68] *Egan v. Mutual of Omaha Life Ins. Co.,* 598 P.2d at 456.

### 4.     Repeated action

The evidence that Defendants' conduct directed towards Merrick was part of an ongoing and widespread corporate plan to obtain financial gain at the expense of their disabled insureds was overwhelming.  The evidence is set forth in considerable, but not complete, detail in §§ III.A and B.  The evidence discussed there establishes Defendants repeatedly engaged in misconduct directly with respect to Merrick through such means as improperly asserting a reservation of rights when they had no basis to do so, twice seeking to strong arm him into low-ball settlements, misrepresenting that their medical reviewers had not found impairment, when in fact they did, misrepresenting that objective evidence was required to obtain claim payment, when it was not, and when they knew it did not and could not exist in light of his illness, refusing to assist him in getting his claim paid, shifting the burden of claims investigation to him, and closing his claim on a rush basis without cause in order to meet monthly, quarterly, and/or year end goals.

The evidence discussed in § III.B establishes Defendants in fact had a widespread corporate plan or scheme to augment their profits through wrongful conduct intentionally taken at the expense of their disabled insureds.  The scope of the ill gotten profits obtained is suggested in part by the facts and exhibits discussed in § III.C.  Defendants' claims that there was no such corporate plan were not credible and are belied on numerous grounds as reflected in the factual discussion and by the jury's verdict.

Based on the evidence introduced at trial and taking into account matters of credibility, the only conclusion to be drawn is that Defendants engaged in a widespread corporate plan, and conscious course of corporate conduct firmly grounded in established company policy, to disregard Merrick's rights and the rights of thousands of other policyholders.  This evidence supports a finding that Defendants conduct was and is highly reprehensible.

### 5.     Malice, trickery or deceit or mere accident

At the first trial of this case the jury determined that Defendants acted with oppression, fraud, or malice.  That finding was affirmed on appeal.  Thus, Defendants arguments that they did not act in such a fashion run up against the prior binding determinations.

In addition, the evidence introduced in the second trial and discussed in §§ III.A-B, firmly establishes that Defendants acted in what can only be described as an intentionally malicious and deceitful manner.  Defendants attempted on two occasions to strong-arm Merrick into low-ball settlements which would have released them from liability.  Defendants misrepresented what their own in-house medical personnel had determined with respect to Merrick's impairment.  Defendants misrepresented the proof required to obtain claim payment.  Defendants failed to reveal to Merrick that they knew his claim could not be proven by objective evidence and instead insisted that he provide it.  Defendants put into place corporate policies designed to hide their bad faith practices behind claims of privilege and destroyed detailed documents related to their claim handling activities.[69]

The credible evidence introduced at trial, clearly establishes that Defendants acted intentionally and maliciously both with respect to the establishment of bad faith claims practices in general, and with respect to Merrick's claim in particular.  That Defendants' conduct has not resulted in criminal prosecution can only be attributed to either a lack of prosecutorial resources, or inadequacies in the criminal law.  This factor also militates in favor of high reprehensibility.

### 6.    Other factors

As noted at the beginning of this analysis, the *BMW/Campbell* analysis only provides guideposts and is not to be considered an analytic straight jacket.  The Court may therefore consider additional factors in assessing both the reprehensibility of Defendants' conduct and determining the amount of punitive damages which may be

---

[69] Ex. 113 at PRL 00019, PRL 00108.

constitutionally imposed in order to affect the State of Nevada's legitimate purposes of punishment and deterrence.

Several additional factors militate in favor of increased reprehensibility: As reflected in § III.D Defendants remain unrepentant.  Even now, even after two juries in this case, the Court in this case, and the Ninth Circuit, in this case, have determined that Defendants conduct warrants punishment, Defendants continue to insist that they have done nothing wrong.

- As reflected in § III E Defendants refuse to accept responsibility for their conduct.
- As reflected in § III.E Defendants instituted policies to hide their misconduct.
- As reflected in § III.E Defendants sought to present false and misleading evidence to the jury.  This included their claims about return to work statistics and their claims that the conduct they engaged in was the result of bad advice received from consultants.  As evidence brought forth on cross-examination established, Defendants statistics were created not in the course of business, but at the request of counsel.  As rebuttal evidence established, Defendants did not even know whether individuals they said could return to work were in fact able to do so.  With respect to their "bad advice excuse" the evidence established that they had had already instituted the wrongful procedures that form the core of their bad faith claim handling practices.  Ex. 46.
- Even after the first jury determined that Merrick was disabled and that Defendants had acted in bad faith, they only paid benefits under a reservation of rights.  Subsequently, after the Ninth Circuit affirmed those determinations, Defendants' continued to make payments under a reservation of rights. Defendants conduct after the first trial and its appeal further deprived Merrick of the peace of mind Defendants' had promised to provide.
- Prior punitive damage awards have been ineffective to punish and deter. Defendants have been repeatedly held liable for punitive damages in ever

greater amounts.  In *Greenberg v. Paul Revere Life ins. Co.,*[70] the court sustained a $2.4 million punitive damage verdict against defendants for their bad faith termination of benefits.  In *Hangarter v. Provident Life and Accident Ins. Co.,*[71] the Ninth Circuit sustained a $5 million punitive award for their bad faith termination of benefits.  In *Ceimo v. General American Life Ins. Co., et al.,*[72]1, the Court sustained a $7,000,000 award against these defendants.

- Despite these awards Defendants conduct does not change.  The reason for this is apparent when one considers the evidence of financial gain and wealth discussed in § III.C *supra*.  Simply put, the prior awards, whether considered individually or collectively, have not been enough to "sting" the Defendants in light of what they have gained.[73]  Even now, the award against Revere only represents less than 2.4% of its net worth as represented by its surplus.  Ex. 341 at 96.  It is half that amount if the court considers the evidence that in the last year it declared cash and stock dividends of approximately one billion dollars to its immediate corporate parent.  *Id.* at 118. As to UnumProvident, the $36 million award represents 0.45% of its net wealth.  Ex. 342 at 29.

- Defendants' expert Robert DiLisio testified the conduct of Defendants was no different than other insurers were and are doing.  While this evidence was disputed, if credited its not done ameliorate the need for punishment and deterrence.  Instead, it enhances that need and a large award is more likely to accomplish that deterrent purpose.

Against these factors which warrant finding that Defendants' conduct is highly reprehensible and that significant awards are needed to accomplish the goals of

---

[70] 91 Fed.Appx. 539 (9th Cir. January 12, 2004), *cert. denied*, 542 U.S. 939 (June 28, 2004).

[71] 373 F.3d 998 (9th Cir. June 25, 2004).

[72] 37 Fed.Appx. 968 (9th June 29, 2005).

[73] *Bains LLC v. ARCO Products Co.*, 405 F.3d 764, 777 (9th Cir. 2005).

punishment and deterrence, Defendants offer two "mitigating" other factors.[74]  No great effort need be spent disposing of them, because, even if true, they would not substantially mitigate the highly reprehensible conduct Defendants engaged in.

First, the fact that Paul Revere paid benefits on the claim before the merger, and after accepting liability without reservation of rights is not a mitigating factor.  This was a contractual obligation.  That Defendants paid additional benefits after terminating the claim, while they sent Plaintiff on a wild goose chase to obtain evidence they knew did not exist, and would not change their decision, is not a mitigating fact.  It was a tactical ploy to cloak their position and deceive their insured about their claim handling practices.

As to Defendants' claim that their decision was "hardly arbitrary," that position is belied by the affirmed jury verdicts for bad faith against both Defendants in the prior trial.   Defendants' claims about "objective evidence," misrepresents the conduct Defendants engaged in towards Merrick and the fact that such conduct misrepresented the terms of the policy as the Ninth Circuit noted in its opinion affirming the prior jury's bad faith determination.[75]

Defendants' misconduct towards Merrick is not mitigated in any degree by the "other factors" they cite.  While indeed other factors are present in this case, they support a finding of increased reprehensibility and need for punishment.

### C.   Reprehensibility Conclusion

Considering all the evidence and the credibility of the witnesses, the only conclusion to be drawn with respect to each of the *State Farm* reprehensibility factors is that they each support a view that Defendants' conduct is and was highly reprehensible.  When the "other factors" are also considered, they too suggest that Defendants' conduct was highly reprehensible.

---

[74] Document No. 514 at 12:4-17 (Defense Memorandum at 7:4-17).

[75] *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (9th Cir. 2007).

### D.      RATIO

Relying primarily on out-of–jurisdiction law, Defendants argue that the *State Farm v. Campbell* ratio analysis requires that punitive damages in this case be no more than 1:1 of the first jury's compensatory award.  Defendants' position ignores the framework for ratio analysis adopted by the Ninth Circuit which it also addressed in its *In re Exxon* opinion.[76]  Defendants' position also makes other analytic errors with respect to this factor.

### 1.      The Correct Ratios

First, with respect to what should be included in the harm suffered or potentially suffered by the Plaintiff (the denominator),[77] Defendants' position, based solely on the first trial compensatory damage award, understates the denominator in four ways:

- Defendants fail to include the post-trial benefits they paid under reservation of rights, which they only paid as a result of Plaintiff prevailing at trial.  That these funds should be included in the denominator is clear because had Defendants succeeded in their bad faith termination, the harm to Plaintiff would have included this amount.  The post judgment benefits paid were $486,799.

- Defendants' denominator also fails to include pre-judgment interest on the monies they improperly withheld.  As per this Court's June 10, 2005 judgment, that amount was $550,173.69.

- Finally, Defendants' denominator also fails to include both, post-judgment interest, reflecting continuing harm to Plaintiff based on Defendants withholding past due benefits, and damages for past harm, $171,646.66, and recoverable costs awarded by the Court, $19,212.54.  This additional amount totals $190,859.20.

---

[76] 490 F.3d at 1093-1094.

[77] Often referred to as the "numerator" in court opinions it is more properly identified as the denominator since the ratio is (punitive damages) / (actual and potential harm).  It is so identified here.

- Lastly Defendants fail to adjust for present value in bringing the denominator current.  Doing so, using the proper post judgment rates 3.3% compounded annually adds an additional $57,564.82 to the denominator.
- As a consequence of the Defendants bad faith conduct the potential and actual harm plaintiff suffered in economic and non-economic damages as of the date of verdict in the second trial was $2,932,751.71.  It is that figure which must be used as the measure of harm and potential harm caused by Defendants bad faith towards Merrick.  As the Court may recall, Defense counsel repeatedly referred the jury to all but the last of these amounts in the second trial as evidence that Merrick had been "fully compensated."

Defendants' second analytic error is to suggest either that only a single ratio applies or that the numerator (the punitive damage amount) must be divided by Defendants' proportionate share of liability.  Neither is correct.

Under both federal constitutional law and Nevada state law punitive damages are to be assessed against individual defendants on an individual basis.  Under constitutional law punitive damages are to be assessed on an individual basis because as stated by the Court in *BMW v. Gore*, "exemplary damages imposed on **a** defendant should reflect 'the enormity of **his** offense.'"[78]  After *State Farm v. Campbell*, the Ninth Circuit has twice held that punitive damages must be assessed on an individual defendant basis.  In *Bell v. Clackamas County*,[79] the court held in a single plaintiff, multiple defendant lawsuit that the district court needed to conduct individualized assessment of the punitive damage liability of each defendant.  Similarly, in *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coalition of Life Activists*,[80] the Ninth

---

[78] *BMW v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 1599 (1996), *quoting Day v. Woodworth*, 13 How. 363, 371, 14 L.Ed. 181 (1852) (emphasis added).

[79] 341 F.3d 858, 867-868 (9th Cir. 2003).

[80] 422 F.3d 949 (9th Cir.2005).

1  Circuit again engaged in individualized reprehensibility analysis in a case involving

2  multiple punitive damage awards for multiple plaintiffs against multiple defendants.

3       Under Nevada law as well, juries individually assess punitive damages against

4  individual defendants, and courts on post-trial review assess the culpability of each

5  defendant individually.[81]

6       Further, in this case, the original jury and the jury in the second trial were both

7  instructed to make individualized assessments of each Defendant's liability for punitive

8  damage[82] and each jury individually assessed the amount of punitive damages each

9  Defendant should be liable for, returning different amounts as to each.[83]  Because

10  individualized assessment is the rule, two ratios, rather than one applies.

11       The facts also suggest that two separate assessments are appropriate.

12  Throughout the litigation Defendants asserted that they were separate entities.[84]  As

13  reflected in Exhibit 146, Defendants structure their business to maintain separate

14  identities.  Having chosen to represent that they are separate entities, separate

15  assessment is entirely appropriate.

16       As to Defendants' second analytic error, suggesting that the denominator must

17  be divided, that too is incorrect.  In this case, the Defendants were jointly and severally

18  liable for compensatory damages and no apportionment of fault for those damages was

19  either requested or made.  Under Nevada law, as demonstrated by *Albert H. Wohlers &*

20  *Co. v. Bartgis*,[85] where there is a single compensatory award for which multiple

21  defendants are jointly and severally liable without apportionment, the entire amount of

22

23  [81] *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. at 1267-69, 969 P.2d 961-62 (in bad
24  faith case jury made separate punitive damage awards against separate defendants
     and appellate court engaged in individualized assessment of each such award)

25  [82] *See, e.g.,* Document 287 at Instruction No. 19 (first trial instruction); Document 506 at
26  Instruction No. 13 (Second trial instruction).

27  [83] *See* Document 283 (first trial verdicts); Document 507, 508 (retrial verdicts).

28  [84] *See* Document No. 485.

[85] *Supra* note 81.

48

that award is used on post-trial review to assess the relationship between the compensatory damages and the punitive damages.  No apportionment was requested in this case, and no factual basis exists for apportionment.  Accordingly, the entire amount of harm and potential harm caused by Defendants should be used in each ratio analysis.

In essence, Defendants argue that they should be punished less than they otherwise would because they each had an accomplice in harming Plaintiff.  That is like two bank robbers claiming that they should split the presumptive armed robbery sentence because there are two of them.  The whole point of the punitive damages due process analysis is to ensure that a defendant has had notice of the potential punishment for its conduct.  Here, each defendant had notice that it could be punished to the tune of a 9:1 ratio for the harm it caused.

Based on the separate assessment of punitive damages of $24 million against Revere and $36 million against UnumProvident, the ratio of punitive damages to Plaintiff's harm for Paul Revere is 8.12:1.[86]  With respect to UnumProvident, the ratio of punitive damages to Plaintiff's harm is 12.28:1.[87]

### 2.     Constitutional Analysis of Ratio

Post *State Farm v. Campbell* and *BMW v. Gore*, the Ninth Circuit has developed its own framework for ratio analysis.  As described by the court in *Exxon*:

> In *Planned Parenthood,* we used this guidance from *State Farm* to construct a "rough framework" for determining the appropriate ratio of punitive damages to harm. *See* 422 F.3d at 962. We held that in cases where there are "significant economic damages" but behavior is not "particularly egregious," a ratio of up to 4 to 1 "serves as a good proxy for the limits of constitutionality." *Id.* (citing *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513). In cases with significant economic damages and "more egregious behavior," however, a single-digit ratio higher than 4 to 1 "might

---

[86] $24,000,000 / $2,932,751.71 = 8.12.

[87] $36,000,000 / $ 2,932,751.71 = 12.28.

be constitutional." *Id.* (citing *Zhang,* 339 F.3d at 1043-44;*Bains,* 405 F.3d at 776-77). Finally, in cases where there are "insignificant" economic damages and the behavior is "particularly egregious," we said that "the single-digit ratio may not be a good proxy for constitutionality." *Id.*[88]

Applying this analytic framework in *Exxon*, the Ninth Circuit concluded that Exxon's conduct of placing a relapsed alcoholic in command of a supertanker was particularly egregious, and that damages in excess of $500 million was "significant".  It accordingly determined that a punitive damage ratio of above 4:1 would be appropriate.  The court concluded, however, that while above 4:1 was appropriate, Exxon's conduct was not so egregious as to warrant an award at the upper end of the spectrum.  As described by the court, the upper end of the spectrum of single digit ratios is "generally reserved … for the most egregious forms of intentional misconduct such as threats of violence and racial discrimination."[89]  Turning back to Exxon's conduct, the court distinguished it from the upper range cases on the grounds that Exxon's conduct did not involve intentional conduct and that it took prompt action to both clean up the spill and to compensate the plaintiff's for their economic harm.[90]  Considering these facts, the court set the appropriate ratio at 5:1.[91]  The Ninth Circuit's decision shows that in choosing the appropriate ratio in a case involving significant economic damage such as this, a higher ratio is appropriate when the defendant's conduct involves elevated reprehensibility such as intentional misconduct.

While this case also involves egregious conduct and significant damages driving it into the second level of the Ninth Circuit's "rough framework," it is not *Exxon.*  Unlike *Exxon,* this case involves <u>intentional misconduct</u> directed at Merrick and thousands of others <u>for financial gain</u>.  Defendants' conduct here is significantly more reprehensible than was Exxon's.  Here, there were multiple actions taken against Merrick as part of a

---

[88] 490 F.3d at 1093.

[89] 490 F.3d 1094.

[90] *Id.*

[91] *Id.*

50

wide-ranging corporate scheme targeting thousands of vulnerable disabled policyholders, in order to augment corporate profits.  It accordingly represents an enhanced degree of punishable culpability favoring an award at the high end of the constitutional spectrum.  Indeed, both the Ninth Circuit's opinion in *In re Exxon*, and the Supreme Court's subsequent opinion in *Exxon Shipping* embrace this proposition.[92]

As established in the factual recitations in §§ III.A and B, and the preceding reprehensibility analysis, the Defendants' conduct in this case was both intentional and malicious.  Defendants in fact threatened Merrick through their assertion of invalid reservations of rights, and through their threats of litigation if Merrick did not give up his claim.  This case involved repeated instances of trickery and deceit directed at Merrick and other disabled insureds as reflected in Exhibits 174, 235, and 325-327.  As established in §§ II.B and C, Defendants conduct was done intentionally for the purpose of financial gain.  As established in § II.C, not only was it done for financial gain, financial gain was achieved.  That financial gain, as only partially measured by those claim payments required by the 42% denial and termination reversal rate, Ex. 612, was well over a billion dollars, the majority of which Defendants, despite all the regulatory processes and prior punitive judgments, continue to possess and benefit from.  Ex. 341, 342.

As further established in the factual recitations and reprehensibility analysis, Defendants conduct was targeted at financially vulnerable individuals and put the health and safety of those individuals, including Merrick, at risk.

Further, rather than accepting responsibility for their misconduct, the evidence at trial established Defendants continue to refuse to accept responsibility and remain

---

[92] *See*, *In re Exxon Valdez*, 490 F.3d at 1094 (9th Cir. 2007) ("high single digit ratios for the most egregious forms of intentional misconduct"); and *Exxon Shipping*, 554 U.S. ___, 128 S.Ct. 2605(2008) ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action") 554 U.S. ___, 128 S.Ct. at 2622.

unrepentant.  §§ II.D and II.E.  Defendants sought to conceal their misconduct and manufactured evidence in an effort to construct a defense.

Given these facts, were it not for the "rough framework" constructed by the Ninth Circuit, this would be one of those cases, where a punitive damage award "exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree"[93] would not violate due process.  Given the fact of the Ninth Circuit's "rough framework," however, reduction to the constitutionally maximum ratio represented by that framework is the Court's only option.

It is again worth noting that the award in *State Farm* ended up being affirmed at a 9:1 ratio, after which the U.S. Supreme Court declined further review.[94]

### 3.    Effect of Prior Payments and Regulatory Settlement Agreements

As a last argument effecting the constitutional question, Defendants argue that the payments they made to Merrick and the regulatory settlement agreements they entered obviate the need for punitive damages.  The jury heard and was instructed about all this evidence, and concluded that despite the payments and despite the regulatory agreements and changes that punitive damages in the amount awarded were necessary to punish and deter.[95]

This is not *Exxon*, where there was no profit motive tied to the defendant's misconduct.  Neither is it like *Exxon* in that these Defendants did not voluntarily take steps to ameliorate the harm that they caused.  The fact that Defendants only paid the amounts they owed Merrick after he obtained judgments against them warrants neither praise nor credit.  Rather, as reflected in the evidence at trial, these Defendants remain unrepentant and refuse to acknowledge engaging in any wrongdoing either with respect

---

[93] *State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U.S. at 425.

[94] *State Farm Mutual Automobile Ins. Co. v. Campbell*, 2004 UT 34, 98 P.3d 409, 415 (Utah 2004), *cert. denied,* __ U.S. __, 125 S.Ct. 114 (2004).

[95] Document No. 506 at Instructions 14, 18, 19, 20.

1  to Merrick, or with respect to the corporate scheme to deny benefits to disabled

2  insureds.

3        On the other hand, there was some evidence that as a result of the regulatory

4  settlement process some changes were imposed upon Defendant companies.  Whether

5  those changes are enough, and pursued with substantial vigor at all levels of the

6  Companies so as to root out the corporate culture that their management took such

7  pains to drive deep into its culture, Ex. 95, remains to be seen.  As Defendants have

8  never acknowledged or taken responsibility for their misconduct, skepticism is

9  appropriate.

10       Further, the regulatory settlements did not deprive Defendants of their ill-gotten

11  gains to any substantial degree.  Even though Defendants have been forced to post

12  additional reserves to cover those claims that they agreed to reopen, they maintain

13  control of those funds and the earnings they generate from them.  Similarly, Defendants

14  have not even attempted to fully compensate those harmed by their misconduct, and, in

15  fact, required individuals who had their claims reopened to waive their rights to full

16  redress.  Ex. 350.  These facts take something away from the ameliorative impact that

17  the Regulatory Settlement Agreements might have had—as the jury so concluded.

18  Additionally, the finding of no violations on the California reassessment was simply in

19  keeping with the prior settlement, Ex. 346, and has no particular value with respect to

20  reducing the appropriate ratio.  The regulatory settlements therefore have no particular

21  value with respect to punishment.  With respect to deterrence, the effects of the

22  changes remain to be seen.  What is clear from the trial testimony, the evidence

23  presented, and the evidence not presented,[96] is that Defendants have a long way to go

24  before there is no need for the deterrent effect of punitive damages in this case.

25

26  _____

27  [96] As noted previously, Defendants did not call a single live witness from the company to
    address either their prior conduct or their post regulatory investigation changes.  This
28  failure to call witnesses occurred despite the fact that they had two corporate
    representatives who were introduced to the jury present throughout the trial.

### 4.      Ratio Conclusion

With respect to UnumProvident, while the current 12.28:1 ratio does not exceed a single digit ratio to a significant degree, compliance with the Ninth Circuit's framework requires scaling it back to 9:1. Scaling back the ratio to 9:1 also gives UnumProvident some credit for the changes imposed by the regulatory process and provides some credit for the emotional distress award previously returned which might remotely be considered to have contained some slight element of punishment.[97]

Because the jury's determination of Revere's punitive liability as compared to harm is already within the constitutional maximum ratio as determined by the Ninth Circuit's framework, no remittitur is required to ensure that the ratio between punitive damages and harm is within constitutional confines.

Nonetheless giving some effect to the regulatory actions and the emotional distress award, and keeping in mind the jury's assessment which appears to attribute a higher degree of reprehensibility to UnumProvident as compared to Revere,[98] the Court should consider reducing the ratio with respect to Revere to a range between 6:1 and 7:1 the mid-range range of ratios appropriate under the Ninth Circuit's "rough framework," to make sure it is not disproportionately punished as compared to UnumProvident.  No more reduction is warranted, and indeed, none at all may be necessary, given the highly reprehensible conduct at issue that was done to augment Revere's profits at the expense of its disabled, vulnerable insureds.  If the Court concludes that Revere's misconduct is comparably reprehensible to UnumProvident's no reduction in an effort to avoid disproportionate punishment between these two defendants is required.

---

[97] *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998 at 1015 n. 11 (in a wrongful denial of disability benefits case there is little danger that an emotional distress award that is a third of the economic damages represents duplicative punitive damages)

[98] That is not the only reason the jury may have concluded different amounts of punitive damages were warranted.  The jury had evidence of, and was permitted to consider the wealth of each Defendant in determining the amount necessary to punish and deter. Exhibits 341, 342, Document No. 506 at Instruction 14.

### D.   COMPARABLE PENALTIES

The last *BMW/Campbell* factor to address is the matter of civil penalties.  As reflected in the Ninth Circuit's *Exxon* opinion, the Court need not dwell on this factor because it is of little importance.[99]  Further, what is clear is that the Nevada legislature considers insurance bad faith both a serious matter, and that it recognizes that substantial punitive damages are necessary to punish and deter such conduct.  As discussed previously, the legislature specifically chose not to impose statutory caps on punitive damages for insurance bad faith.  Such an exception, in the face of a prior Nevada Supreme Court case approving punitive damage ratios approaching 30:1 suggests that, but for the Ninth Circuit's "rough framework" ratio analysis, the current awards as to both Revere and UnumProvident is constitutionally permissible.

### E.   NEVADA LAW

In 2006, as a matter of judicial economy, the Nevada Supreme Court adopted the *BMW/Campbell* three factor analysis for post-trial review of punitive damage awards.[100] An award that is not constitutionally excessive will easily not be excessive under Nevada law.  As the above constitutional analysis suggests, the jury's verdict as to Revere satisfies both federal constitutional concerns and is not excessive under Nevada law.  With respect to UnumProvident, the jury's verdict as entered would not be excessive under Nevada law, but in light of federal constitutional requirements, remittitur to a 9:1 ratio is required.  Given that, the remitted amount is certainly not excessive under Nevada law.

Consideration of Nevada's interest in punishment and deterrence confirms that the range proposed by Plaintiff comports with due process considerations.  Contrary to the Defendants' suggestion,[101] an award must be "grossly excessive" with respect to the

---

[99] 490 F.3d at 1094.

[100] *Bongiovi v. Sullivan,* 122 Nev. 556, 138 P.3d 433, 452 (2006).

[101] Document No. 514 at 8:4-5 (Defendants' Memorandum at 3:4-5).

state's interests before due process considerations arise:  "**Only when** an award can fairly be categorized as '**grossly excessive**' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."[102]

In this case, not only are the proposed awards not "grossly excessive" in relation to these interests, anything less would undermine Nevada's interests in punishment and deterrence.  With respect to punishment, although "[t]he wealth of a defendant cannot justify *an otherwise* unconstitutional punitive damages award,"[103] it is a legitimate factor for consideration in determining the amount of an appropriate award.   Here the amounts awarded by the jury are 0.45% of Unum/Provident's net worth, Exhibit 342 at 29, and less than 2.4% of Revere's net worth. Ex. 341 at 96.  For the punishment to have any "sting" at all, it must be at least in the range proposed by Plaintiff.[104]

With respect to deterrence, states have long recognized the importance of "the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss."[105]   In this case, Defendants

---

[102] *BMW of N. Am. v. Gore*, 517 U.S. at 575 (emphasis added); *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. at 416-17 (same).

[103] *State Farm*, 538 U.S. at 427 (emphasis added), using the defendant's wealth in setting the level of punitive damages is not "unlawful or inappropriate."  *BMW*, 517 U.S. at 591 (Breyer, J., concurring).

[104] In Albert H. *Wohler's v. Bartgis*, 114 Nev. at 1268-1269, 949 P.2d at 962 the Nevada Supreme Court, in reducing punitive awards remitted one to an amount that was approximately 6.2% of one of the defendant's net worth.  To the extent that "sting" is a percentage of net worth the percentages as to these Defendants are well within permissible ranges under Nevada law

[105] *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 22 (1991) (O'Connor, J. concurring in part, dissenting in part) (noting the appropriateness of such a consideration by a state); *see also BMW*, 517 U.S. at 566 (noting as a pertinent factor that "the nondisclosure was profitable for the company"); *Exxon Shipping* 554 U.S. at ___, 128 S.Ct. at 2622 ("Action taken or omitted in order to augment profit represents an enhanced degree of punishment culpability . . . . "); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (when the wrongdoer gains financially from the conduct, an award of punitive damages may help "limit[] the defendant's ability to profit from its fraud").

reaped enormous profits from their illegal scheme, and hoped just in this case to steal

millions from one of their insureds.  Defendants also structured their wrongdoing so as

to avoid getting caught, meaning that only an award many times greater than the

potential profit would provide any real deterrent effect.  Conversely, reducing the award

to anything less than Plaintiff's proposed multipliers would grossly undermine Nevada's

legitimate interests in punishment and deterrence, and the Court should specifically so

find.

**F.     OTHER MATTERS**

        **1.     The Federal Maritime Law Decision In *Exxon Shipping Co. v. Baker*,[106] Is Not Relevant To This Court's Constitutional Due Process Analysis Of A Verdict Rendered Under State Law**

Not surprisingly, Defendants seek to expand the Supreme Court's ruling in *Exxon*

*Shipping Co. v. Baker* to suggest that it sets a limit on the amount of punitive damages

that are constitutionally sustainable in a Nevada state law bad faith action, or

alternatively that the Nevada Supreme Court would adopt the *Exxon Shipping*  decision

as a matter of state decisional law in insurance bad faith cases.[107]   Neither argument is

compelling or withstands analysis.

        **a.     *Exxon Shipping Co. v. Baker* does not limit punitive damages under constitutional review**

First, the majority opinion in *Exxon Shipping* took pains to limit itself to matters of

maritime law and specifically never conducted any constitutional analysis of the punitive

damage award issued by the jury.  The Court limits it decision in the very first sentence

of the opinion.[108]   Further in arriving at its conclusion about the appropriate case specific

---

[106] 554 U.S. ___, 128 S.Ct. 2605 (2008).

[107] Document No. 514 at 7:4-23, 25:4-26:22 (Defendants' Memorandum at 2:4-23, 20:4-21:22).

[108] 554 U.S. at ____, 128 S.Ct. at 2611:

    There are three questions of maritime law before us:  whether a shipowner may be liable for punitive damages without acquiescence in the actions

1   ratio in *Exxon Shipping*, the Court takes specific care to distinguish its decision under

2   federal maritime law from the due process analysis that this Court must conduct.[109]

3       Second, considering the concurring and dissenting opinions in *Exxon Shipping,* it

4   is clear that a majority of the Court was not expressing any view with respect to

5   constitutional limits that have applicability to this case.  In their concurring opinion,

6   Justices Scalia and Thomas make clear that they continue to adhere to the view that

7   there is no constitutional limit on punitive damages in state cases.[110]  Justice Stevens,

8   who voted in the *Campbell* majority, dissented from the Court's legislative activism and

9   its creation out of whole cloth of a common law limit on punitive damages in maritime

10  law.[111]  Similarly, Justice Ginsberg, who dissented in *State Farm v. Campbell,* dissented

11  in *Exxon Shipping* for reasons similar to Justice Stevens.[112]  Finally, Justice Breyer, who

12  joined the majority opinion in *Campbell*, dissented on the grounds that Exxon's

14          causing harm, whether punitive damages may have been barred implicitly
15          by federal statutory law making no provision for them, and whether the
16          award of $2.5 billion in this case is greater than maritime law should allow
            in the circumstances.

17  [109] *Id.* 554 U.S. at ___, 128 S.Ct. at 2626-27:

18          Today's enquiry differs from due process review because the case arises
19          under federal maritime jurisdiction, and **we are reviewing a jury award
            for conformity with maritime law, rather than the outer limit allowed
            by due process;** we are examining the verdict in the exercise of federal
20          maritime common law authority which precedes and should obviate any
21          application of the constitutional standard.  Our due process cases, on the
            contrary, have all involved awards subject in the first instance to state law.
22          ***

23          **Our review of punitive damages today, then, considers not their
            intersection with the Constitution**, but the desirability of regulating them
24          as a common law remedy for which responsibility lies with this Court as a
25          source of judge-made law in the absence of statute.

26  (emphasis added).

27  [110] *Id.* at ___; 128 S.Ct. 2634 (concurring opinion of Scalia, J. and Thomas, J.)

    [111] *Id.* at ___-___, 128 S.Ct. at 2634-2638.

28  [112] *Id.* at ___, 128 S.Ct. at 2639-2640.

misconduct warranted a higher level of punishment, at least at the level the Ninth Circuit concluded was proper.[113]  Thus, the Supreme Court's decision in *Exxon Shipping*, rather than informing this Court of limits applicable under constitutional law, is limited by its own terms to federal maritime law, and a majority of the deciding justices would apparently object to its application in the constitutional realm where the Court is concerned not with mere excess but with constitutional outer limits.

>   **b.    The Nevada legislature's specific exemption of insurance bad faith claims from legislatively enacted punitive damage caps, and the Nevada Supreme Court's prior approval of punitive damages approaching a 30:1 ratio as compared to compensatory damages suggests that the Nevada Supreme Court would not adopt *Exxon Shipping Corp. v. Baker's* 1:1 ratio in maritime cases for insurance bad faith cases**

In their last argument, Defendants contend that if presented with the issue, the Nevada Supreme Court would adopt the decision in *Exxon Shipping Corp. v. Baker*, as a rule of decision limiting punitive damages in insurance bad faith cases.  Nothing suggests this would be the case.

First, unlike the area of federal maritime law, the Nevada legislature has considered limits on punitive damages, has enacted legislation concerning the same, and in enacting that legislation specifically rejected capping punitive damages in insurance bad faith cases.[114]  In light of the legislature's rejection of statutory ratio limits in insurance bad faith cases, it is hard to imagine that the Nevada Supreme Court would create such limits.  Further, nothing suggests the court would adopt limits *less* than what the legislature has authorized for other torts.

Second, in rejecting statutory limits, the Nevada legislature is presumed to have been aware of the Nevada Supreme Court's prior decisions in the area of insurance bad

---

[113] *Id.* at ___, 128 S.Ct. at 2640-2641.

[114] NRS 42.005 (2)(b); NRS 42.007(2) (exempting insurance bad faith from limitations on the amount of punitive damages established by the legislature)

faith.  Prior to the enactment of legislative caps on punitive damages, the Nevada Supreme Court had sustained a punitive damage award approaching a 30:1 ratio in *Ainsworth v. Combined Ins. Co.*[115]  Despite this decision, the legislature specifically exempted insurance bad faith claims from punitive damage caps either under a strict financial limit or under its ratio cap.

After, the imposition of caps on certain punitive damages, the Nevada Supreme Court reduced a punitive award from in excess of 27:1 to 13.6:1 in *Albert H. Wohlers & Co. v. Bartgis.*[116] The Court expressed no common law rule of general decision with respect to ratios.  Neither did it express constitutional concerns over this ratio which exceeded a single digit by 4 and a 1:1 ratio by more than 12.  Moreover, a comparison of the conduct in both *Ainsworth* and *Wohlers*, to that displayed by the Defendants in this case, would suggest that but for any constitutional outer limits imposed by *State Farm v. Campbell*, the Nevada Supreme Court would have no problem sustaining the full amount of the verdicts rendered here under a state law challenge.

Defendants' argument that the Nevada Supreme Court would adopt *Exxon Shipping Co. v. Baker's* maritime law ratio constraint on punitive damages as a state law rule of decision for insurance bad faith cases is inconsistent with Nevada's statutory and common law.

## V.    CONCLUSION

Considered alone, the punitive damage award against Defendant Paul Revere is not constitutionally excessive, nor excessive as a matter of Nevada law.  The conduct of Revere, intentionally engaged in by Revere against its disabled insureds to augment profit, represents an enhanced degree of punishable culpability.  Under the Ninth Circuit's "rough framework," a punitive damage ratio of 8.12:1 is fully sustainable against constitutional challenge under the facts of this case.

---

[115] 763 P.2d 673 (Nev. 1988).

[116] 114 Nev. 1249, 969 P.2d 949 (Nev. 1999).

Considered alone, the punitive damage award against Defendant UnumProvident while in excess of a single digit ratio is not constitutionally excessive in light of the highly reprehensible nature of its conduct as documented herein.  The evidence clearly, convincingly, overwhelmingly established that it engaged in its intentional misconduct towards its disabled policyholders to augment profit.  Just as with Revere, such actions represent an enhanced degree of culpability.

Such award cannot, however, be considered alone.  The Ninth Circuit's "rough framework" requires that it be reduced.  Such a reduction to a ratio of 9:1 is appropriate under the Ninth Circuit's ratio analysis, taking into account that Defendant UnumProvident intentionally and maliciously targeted Merrick and hundreds of thousands of  its disabled and vulnerable policyholders and put even more of them at risk for its own financial gain.

In light of the apparent necessity to reduce the award against UnumProvident, the Court should consider whether it is necessary to reduce the ratio with respect to Revere, if it believes that its conduct was less culpable than UnumProvident's.  The jury's differentiated awards suggest that it may have viewed UnumProvident as more culpable than Revere.  If the Court is of a similar opinion, it should consider whether it is necessary to reduce the award against Revere, not because of absolute constitutional excessiveness, but because, as compared to UnumProvident, it would be disproportionately harsh punishment if it remained unchanged.  Any such reduction to maintain proportionality should not reduce the award against Revere below a 6:1 ratio.  Revere's conduct was highly reprehensible and reduction below 6:1 fails to acknowledge the intentional and highly reprehensible nature of its misconduct.  If the Court does not believe the conduct between the two Defendants represented different levels of reprehensibility, then no reduction to maintain proportionality is warranted.

Dated this 5th day of August, 2008.

/s/ Richard H. Friedman
Richard H. Friedman
Friedman, Rubin & White

And

/s/ Julie A. Mersch
Julie A. Mersch
Law Office of Julie Mersch
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 5th day of August, 2008, I electronically filed the foregoing PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR NEW TRIAL, REMITTITUR OR REDUCTION OF PUNITIVE DAMAGES with PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW with the Clerk's Office using the CM/ECF System which provides for the transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Robert J. McKennon, Esq.
Robert E. Hess, Esq.
BARGER & WOLEN, LLP
19800 MacArther Blvd., 8th Fl.
Irvine, CA 92612
Attorneys for Defendants/Appellants

James Pico, Esq.
PICO ROSENBERGER
1916 S. Eastern Ave.
Las Vegas, NV 89104
Attorneys for Defendants/Appellants

/s/ James A. Hertz
James A. Hertz
Friedman, Rubin & White

Attorneys for G. Clinton Merrick