Julie A. Mersch, Esq.
Nevada Bar No. 004695
e-mail:  jam@merschlaw.com
701 S. 7th Street
Las Vegas, NV 89101
702-387-5868
702-387-0109 fax

Richard H. Friedman, Esq.
e-mail:  rfriedman@frwlaw.us
Friedman, Rubin & White
1126 Highland Avenue
Bremerton, Washington 98337
360-782-4300
360-782-4358 fax

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| G. CLINTON MERRICK, JR., | ) | CASE NO. CV-S-00731-JCM-RJJ |
| | ) | |
| Plaintiff, | ) | (Proposed) |
| | ) | **FINDINGS OF FACT AND** |
| vs. | ) | **CONCLUSIONS OF LAW RE:** |
| | ) | **DEFENDANTS' MOTON FOR NEW** |
| PAUL REVERE LIFE INSURANCE | ) | **TRIAL, REMITTITUR OR REDUCTION** |
| COMPANY, *et al.*, | ) | **OF PUNITIVE DAMAGES** |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**I.     INTRODUCTION**

On June 25, 2008, the jury in this matter returned punitive damage verdicts against each of the Defendants.  Document Nos. 507, 508.  Judgment was entered by the Court on July 3, 2008.  Document No. 512.  On July 18, 2006, Defendants' filed a motion for new trial, remittitur or reduction of punitive damages.  Document No. 514. On August 5, 2008, Plaintiff filed his responsive pleading.  Document No. 515.  Having independently assessed the facts of the case and taking into account the Court's view

1

of the credibility of witnesses and the arguments of the parties, the Court now enters the findings of facts and conclusions of law set forth below.

Before entering those detailed findings and conclusions an introductory comment is appropriate.  It is unlikely this Court has ever presided over a case more deserving of the maximum allowable punitive damages award.  The Court and jury heard evidence of multiple corporate decisions, made from 1994 until the present, designed to cheat disabled policyholders out their benefits.  The Court also heard evidence that the profits from this scheme were astronomical, and that repeated jury awards and government investigations and sanctions have been ineffective in curtailing this behavior.  Were it not for the constitutional due process constraints discussed in § III of these findings and conclusions, this Court would permit the verdicts returned by the jury to stand unaltered.

## II.    FINDINGS OF FACT

Throughout the trial the Court kept careful notes of the testimony of witnesses and the exhibits that the parties relied upon.  In coming to these factual findings the Court had the opportunity to assess the credibility of witnesses.  The Court observed the witnesses on direct and cross-examination.  Among other things, the Court had the opportunity to assess witness demeanor and these findings are based in part on these credibility determinations.

### A.    Defendants Were Engaged In A Scheme To Deny Claims Of Their Disabled Policyholders

The Ninth Circuit has previously found that evidence exists that these Defendants "had a conscious course of conduct firmly grounding in established company policies that disregarded the rights of insureds."  *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1014 (9th Cir. 2004).  The evidence described here, more extensive than that described in *Hangarter*, and more extensive than that admitted at the first trial of this matter, when the jury returned a punitive verdict of $8,000,000 against UnumProvident and $2,000,000 against Revere, clearly, convincingly and overwhelmingly, supports this factual conclusion.

2

1. Early in the 1990's Defendant UnumProvident realized that the claims made on the own occupation insurance policies that it sold were putting the company at risk.  Ex. 22.

2. As a consequence the company underwent a major restructuring of its claim handling practices and philosophy.  Provident went from a company that had a claim payment philosophy to one that had a claims "management" philosophy.  The results were profound.

3. Among the tactics that Provident developed as part of its new claims management approach was the targeting of what it labeled "subjective claims."  These were claims based on mental or nervous disorders or claims such as fibromyalgia or CFS.  These claims which could not be proven by hard medical evidence such as an x-ray were thought to contain a large potential for resolution based on the vulnerability of insured's to pressure tactics.  Ex. 44, Ex. 113 at 331.

4. Another of the tactics that Provident implemented was its practice of claim objectification.  Through its practice of imposing objective evidence requirements on its insureds, when its policies contained no such standard, Provident sought to defeat their claims.  This standard was imposed even on claims, like Merrick's, where the company knew there was no way to obtain objective evidence.  Ex. 174; Ex. 235; Ex. 326; Ex. 327; Ex. 348.

5. A third tactic that Provident developed was its use of round table reviews.  These reviews which involved claim personnel, medical staff, vocational staff, legal counsel, and management personnel focused on high indemnity claims.  Ex. 99.  While notes were occasionally made of what direction the claim should take after a round table review, company policy was to destroy all information regarding who participated in the meetings, what was discussed, and the basis for any decision.  Ex. 113 at 108; Ex. 325, Ex. 326, 327.  Defendants' also attempted to

cloak the round tables with the attorney-client privilege in order to further insulate the actual claims decisions and basis therefore from review.  Ex. 99, Ex. 6.

6.  A fourth tactic that was developed was the Defendants' practice of shifting the burden of claims investigation to the insured.  Ex. 235; Ex. 325, 326, 327.  It was undisputed it is an insurer's duty to conduct a reasonable investigation into all available relevant information prior to denying a claim.  It was undisputed that an insurer must conduct a reasonable and fair evaluation of the evidence in a non-adversarial fashion.  It was undisputed that an insurer may not deny or terminate a claim based on speculation.  It was undisputed that an insurer may not use biased or predictable experts.  It was undisputed that insurers have a duty to assist the insured with the claim.  Ex. 218.  Despite the existence of these undisputed obligations that exist in the handling of first party claims, the evidence established that Defendants instructed their employees that it was the insured's obligation to prove his claim.  Ex. 229.  Employees were instructed to limit their use of independent medical examinations.  *Id.*  They were told that IMEs were not to be used unless absolutely necessary.  *Id.*

7.  The limitation on the use of IMEs to gather information was part and parcel of another practice—that of overvaluing the opinions of in-house medical personnel who never examined the insured over the opinions of either treating physicians or IME doctors.  Ex. 235.  As set out below, Defendants engaged in that conduct in Merrick's case.

8.  Similarly, Defendants in-house medical personnel engaged in cherry picking records to find grounds for denying claims regardless of actual merit.  Ex. 235, 325.  Documentary evidence established that in-house medical personnel "focus upon any apparent inconsistencies in the medical records or other information supplied by claimants, rather than attempt to derive a thorough understanding of the claimant's medical condition."  Ex. 235.

4

9.  The evidence established that Defendants had a practice of piecemealing claimants' medical conditions and did not consider the totality of the medical circumstances.  Ex. 235, Ex. 325.  As discussed below, Defendants did that in Merrick's case.

10. Defendants set targets and goals for claim terminations to obtain financial gain and without respect to claim merit.  Ex. 325, Ex. 326, Ex. 327. Defendants' denied the existence of such targets and goals but the evidence at trial on this point was overwhelming.  The testimonial and documentary evidence

    a.  Established the existence of targets and goals to terminate claims. Testimony of Stephen Rutledge; Testimony of Stephen Prater;

    b.  Established the existence of net termination ratio targets on a corporate basis, Ex. 1, 5, 46, 68, 111, 115, 116, 124, 135, 141, 144;[1]

    c.  Established the existence of financial targets for closing claims on a corporate basis, Ex. 49, 52, 95;

    d.  Established that those corporate goals were transmitted to claim handling units which felt the "reserve pressure," Ex. 68, 268;

    e.  Established that claim handling units were requested to obtain certain amounts in claim closures or recoveries, Ex. 239, Ex. 242;

    f.  Established that when units were not able to make their goal on a weekly basis that they were required to develop written action plans to bring their closures in line with the goals that were set.  Ex. 232;[2]

---

[1] Defendants claimed, and there was evidence that not all terminations are the result of improper denials.  That is undoubtedly true.  Individuals do get better and return to work.  Policyholders' benefits expire.  Policyholders age out so that benefits are no longer payable.  And, policyholders die.  But, the evidence also established that the Defendants set targets and goals beyond their actuarial expectations for claim closures based on these factors.  The evidence established that Defendants went looking for ways and claims to close in order to meet their financial goals.

[2] The Worcester Resolution Consistency Strategy stated in part:

g. Established that these targets and goals were communicated to claim handling employees by such means as e-mails, and weekly Staff Meetings.  Ex. 261, [3] Ex. 260,[4] Ex. 259,[5]  Ex. 262, Ex. 232;[6]

---

Each Impairment Units will be evaluated weekly to determine if recovery momentum is more less concentrated than expected, based on historical month-end recovery averages.  Units that are less concentrated than expected will be charged with the task of developing a written, detailed Action Plan designed to identify causes for the slower than expected momentum and outline activities that will be initiated to bring momentum back in line with expectations.  These Action Plans will be developed and reviewed with me within 24 hours of release of the Monthly Trends report.  This exercise is designed to achieve greater accountability at all management levels for consistent results week to week.

Furthermore, additional emphasis will be provided at each of my weekly Staff Meetings, as well as at each Impairment Head Staff Meeting, not only around forecasting (and forecasting methodology) but also around current trends and focus on improved momentum as necessary.

[3]   "Beingness" is the state in which you are ever present in whatever activity you are engaged in; IE absorbed in what you are currently doing.  That is better than being recoveryless….

Dated June 10, 2002 6:28 AM

[4] This e-mail is entitled "YIPPEEEEEE!!!."  It states in part:

We had yet another excellent week. …

No Reopens…. Month to date

***

We are already at $608,000 in recoveries well ahead of schedule.

We are still lagging with projections so we need to add more to the projection list.

Also, we don't have any rtw success stories on the board yet.

Overall, we are cranking…. Thank you!!!!!

Dated June 10, 2202, 9:47 AM(emphasis in original) "Recoveries" is a term synonymous with "claim closures."

[5] An e-mail which reflects the pressure being put on claim personnel to find claims to close states:

Folks:

As luck would have it, we are running out of it. …

6

h.   Established that to further pressure and give incentive to claims personnel to find reasons to terminate claims, stock boards were set up in the claims units and updated throughout the day so that claim personnel could see how their activities were contributing to the UnumProvident's financial results.  Ex. 232;[7] and

i.   Established that the corporate plan and scheme permeated the company and was known to and endorsed at the highest levels when the head of claims reported to the Board of Directors.  Ex. 281.[8]

---

We are projected to have 1,800,000.00 in recoveries this month but are coming up short at 1,772,000.00… this includes the following that I would like updates on today:

\*\*\*

**Are there any other claims that are possible recoveries this week????**

Dated June 25, 2002 8:55 AM (emphasis in original)

[6]  *See* note 2 *supra*.

[7]  This document contained within Exhibit 232 states:

UnumProvident stock boards will be erected on all Customer Care Center floors.  The stock price will be updated periodically throughout the day by an administrative assistant.  The stock boards will serve to raise awareness of corporate performance levels and build a greater sense of pride among the staff for Worcester's contributions to the corporation's performance.

Encouraging claim handling employees to evaluate their performance based on their contribution to corporate stock price further supports the conclusion that Defendants were turning their claims handling operation into a profit center.  This, despite the undisputed evidence, that it would be inappropriate to use the claims operation in such a manner.  Ex. 218.  Further, not only were employees encouraged to consider their performance based on stock price, employees were actually made stock holders in the company.  Ex. 188 at MERG 0111, 0166.  The use of stock boards in claim units contributed to a corporate culture which elevated the financial interest of the Defendants and employees over that of claim making policyholders.

[8]  This March 29, 2000 Board of Director Meeting Minute states:

Mr. Mohney discussed the customer care organization.  He introduced Mr. Arnold who he noted would be taking over the management of the Portland Customer Care Center.  He described metrics for measuring

11. Provident was not the lone insurer facing financial difficulties as a result of the poor product design, over marketing, and poor underwriting of its own occupation policies.  Other insurers faced similar problems.  Many of them left the disability insurance business.  Paul Revere was one of the other large disability insurance companies that had also heavily marketed the own occupation individual disability products.  It too, had faced difficulties arising from these products and it too had to revamp claim processes. Ex. 44

12. In April 1996 Provident and Paul Revere announced that they were going to merge.  The merger was completed in the end of March 1997.  In 1999, Provident Companies, Inc. merged with Unum to form UnumProvident.  In 1998, Provident Companies, Inc. and Revere entered into a General Services Agreement.  Ex. 146.  Under that agreement, Provident, and later UnumProvident, took over all responsibility for handling, Revere claims.  *Id.*

13. Before the General Services Agreement, and before the merger was even completed, Provident was influencing Revere's claim processes.  *See, e.g.*, Ex. 114, Ex. 120, Ex. 122; Ex. 154.  By July 1996 transition teams were formed to, among other things; identify "Best Practices" that the combined entities would follow.  Ex. 104.  In October, 1996 Provident undertook to train all of Revere's field investigators in "Best Practices."  Ex. 114.  These "Best Practices" included

---

performance.  Improvements reflecting the implementation of the model previously used in Chattanooga and Worcester, in the Portland, Chicago and Glendale customer centers were described.  Mr. Mohney noted that they were seeing aggregate improvement and he was confident of the ability to meet the plan level previously proposed., although they were somewhat behind plan at this point. … Members of the Board questioned the effect of the timing of improvements in the claims management process on reserves.  Mr. Greving stated that the objectives were achievable and that the Company could incrementally strengthen. Although this could have an effect on earning, he did not see any problem with respect to reserves in the next year.  Mr. Mohney stated his belief that the goals were achievable and that the same process consistently applied should create similar results that would support the target.

the claim objectification process Provident had adopted as one of its techniques.
The round table process was brought to Revere in February, 1997 and
implemented on a daily basis before the merger was completed.  Ex. 268, Ex.
270, Ex. 120, Ex. 122.

**B.**    **Defendants' Scheme Was Engaged In To Augment Their Profits At The Expense Of Their Disabled Insureds' And Defendants' Profited Enormously**

Not only did the evidence at trial establish the existence of a corporate scheme to
augment profits without regard to the rights of their disabled insureds, it established
that, in fact, Defendants profited immensely from their misconduct.  The evidence
related to this issue extends from 1994 to the present and is briefly recapped here.

14. An in house analysis authored by Provident's head of risk management in 1994
concluded that the company's non-cancellable own occupation policies
substantially impaired its financial capabilities.[9]

15. In response to the financial crises Provident redesigned its claim process.  It
recognized that such redesign carried with it "tremendous leverage."  Ex. 33.

16. Among the areas recognized as creating large financial opportunities were
psychiatric claims and field investigators.  Ex. 44.  As reported in that document
Revere was using its field investigators to close claims.  Defendants were
encouraged that by changing their claim handling practices they could achieve
substantial savings.  Ex. 45.  Chronic fatigue claims were sent to the psychiatric
claims unit for intense handling.  Ex. 75.

---

[9] Exhibit 22:

The disability operation continues to generate large statutory losses since
no special reserve was recorded on the statutory side jeopardizing the
company's ratings and financial flexibility.  Further, the existence of the
special reserve on the block of business written prior to 1994 creates a
huge drag on the company's reported ROE.  Over $300 million of capital
stands behind the special reserve block of business and essentially all
earnings other than the return on capital and surplus have been zeroed
out.

17. As the Company completed its analysis, it recognized that changing its claim practices, could have a large payout.  Initial estimates suggested that the company could save between $30 and $60 million annually.  Ex. 46.  Adjusters were directed to make top ten lists of claims where "intensive effort will lead to successful resolution of the claim."  Ex. 61.

18. It soon became obvious, that the Company had wildly underestimated the financial gain it could achieve by changing from a claim payment to a claim management mode.  Ex. 54, Ex. 59, Ex. 69, Ex. 73, Ex. 77, Ex. 80,[10] Ex. 87, Ex. 95, Ex. 102, Ex. 104, Ex. 106, Ex. 108, Ex. 111,[11] Ex. 115, Ex. 116[12]

19. The Company began setting financial goals for terminations that were well above what it had traditionally been able to achieve.  E.g., Ex. 52 (setting forth second quarter 1995 goal for terminations of $132 million dollars, and reporting, "We have a good shot at making goal which is 10% above last year.")

20. Ultimately Provident Companies, Inc. went from a company with little financial flexibility to a company with over $8 billion dollars in total stockholder equity.  Ex. 342 at 29.

21. Revere in turn accumulated a surplus of over $1 billion in 2007 after declaring stock and cash dividends of approximately $1 billion. Ex. 341 at 96, 118.

22. Other evidence suggests that much of this accumulation in value came at the expense of Defendants' policyholders.

---

[10] In a January 1996 Memo Ralph Mohney wrote to Tom Heys:

> Overall, we are both pleased and encouraged with the results of the claim management activities during the quarter.  The $114.8 million of net terminations (terminations minus reopens) represents a record level and is 28 % ahead of the previous four quarter average.  Moreover, the fourth quarter represents the 3rd consecutive quarter of $100 million or more in net terminations.

[11] Reporting a reduction of reserves of $121 million over the prior year.

[12] Reporting an annual net resolution ratio of 98%, 14% more than what had been earlier set as a goal.  Ex. 116.

a. Under the limited claim reassessment process required by the Multistate Market Conduct Examination settlement process, Defendants were required to make claim payments and post additional reserves of approximately $676.2 million dollars.  Ex. 612.

b. These additional reserves and claim payments represented money owed to a fraction of the claimants whose claims had been denied between 1997 and 2005 and who elected to participate in the claim reassessment process required by the Multistate settlement.  Ex. 612.  Out of over 290,903 claimants that the Defendants mailed notices to, only 78,422 opted in.  Of that number only 23,190 completed the complex forms necessary to have their claims reassessed.[13]  Of that number, the Defendants reversed position on 41.7% of the claims.

c. While Defendants would suggest that those who did not participate in the reassessment were satisfied with the initial claim handling, little credible evidence supports such a conclusion.  It is equally or more likely that some individuals did not participate because 1) they did not receive notice; 2) they died; 3) their trust in the company had been so abused they chose not to participate; 4) that the forms were so complex or required the provision of information the insured did not have so that they were unable to complete them; 5) they did not have the basis to know whether their

---

[13] For example, the form asks the participating claimant to provide detailed information about the policy number, claim number, a detailed explanation about why the insured believed their claim had been mishandled (a difficult task at best in the absence of detailed knowledge concerning claim handling practices, standards, and these Defendants perversion of the same, lengthy detailed employment history, lengthy detailed medical form, other benefit information (without revealing that if the insured had sought unemployment benefits the company might take the position that they were not disabled because their occupation was unemployed), Ex. 174 at 186, Ex. 347, *See, e.g., Norcia v. Paul Revere Life Ins. Co., supra* note 13; *accord Burriesci v. Paul Revere Life Ins. Co.,* 255 A.2d 993, 679 N.Y.S.2d 778 (Sup.Ct.App.Div. 1998) (defendant engaged in bad faith by classifying insured's occupation as unemployed while injured while out of work and on unemployment).

claim had been improperly denied or terminated,[14] and/or 6) they did not want to give up legal rights they might have as required if they obtained benefits under the reassessment process.

    d.  Further supporting the conclusion that many of the non-reassessed claims would have resulted in additional payments (and not reassessed remain as improperly obtained financial gain) is the fact that approximately 42% of the reassessed claims resulted in additional payment. Ex. 612.

23. Other evidence also suggests that the amount of newly made payments and posted reserves understates the Defendants financial gain by a substantial degree. Exhibit 95 established that during the first quarter of 1996 as part of its scheme Defendants was reporting quarterly terminations of $147.2 million "up 15.1 million (11.4%) from the previous four quarter average." It goes on to note that these quarterly results "demonstrates that the investments in claim effectiveness over the last eighteen months are beginning to pay substantial dividends." *Id.* Exhibit 52 showed Defendants with a target of $132 million in quarterly claim terminations. Exhibits 239, 242, 259 demonstrate that the Defendants were seeking millions of dollars in claim terminations from individual claim units month after month. Such is reflected as well in the monthly unit reports introduced into evidence with which demonstrate the pressure to achieve high net termination ratios, *see, e.g.,* Ex. 137, 141, 144, 331,[15] 333,[16] and

---

[14] "Yes, as through this world i've wandered i've seen lots of funny men; some will rob you with a six-gun, and some with a fountain pen." Woody Guthrie, *Ballad of Pretty Boy Floyd* (1939).

[15] Reporting Worcester's September 1999 Net Resolution Ratio in Reserves for individual disability claims of 108.6% and reporting it as an improvement over July and August of that year. In the same document the Worcester claims operation reports an LTD net resolution ratio in reserves of 120.6%.

[16] Reporting on Worcester results and characterizing them as "unfortunate" because they were lower than average. The document further addresses how Worcester will remedy such "unfortunate" results:

millions of dollars of terminations through the roundtable process Ex. 268, Ex. 270.

24. Based on the credible testimony about targets and goals, documents, and the duration of Defendants' misconduct, there is every reason to conclude that Defendants gained well in excess of a billion dollars as a result of their claims handling misconduct.

**C.    The Claims Handling With Respect To Merrick's Claim And The Harm He Suffered**

Not only did Plaintiff establish the existence of a corporate scheme to augment profits at the expense of disabled policyholders, Merrick established that his claim was mishandled in a manner consistent with that scheme.

25. Plaintiff purchased a non-cancellable, guaranteed renewable, own occupation, disability insurance policy from Defendant Paul Revere Life Insurance Company in 1989.

26. Under the terms of the policy Merrick was entitled to benefits, if, due to illness or injury, he was unable to perform the material and substantial duties of his occupation.  The policy does not require the existence of a particular injury or illness or even any diagnosis.  If disabled from his occupation under the policy Merrick was entitled to benefits of $12,000 per month for as long as his disability lasted or until age 65, whichever came first.  Merrick's policy was one of the "Cadillac" policies that disability insurers had sold in the 1980's and 1990's to doctors, lawyers, and other professionals.

---

We are committed to a continued focus on activity levels, action plans and roundtable reviews, which will improve our claim management effectiveness.  We will be using "min-roundtable" beginning in August as a form of follow-up on claims previously presented in roundtable, but which remain outstanding.

In light of Exhibit 333, 268, and 270, there can be little question, that the purpose of the roundtables continued to be a means to find a way to close claims, just as from their inception. Ex. 69, 85, 99, 135.  No other interpretation of the Defendants' purpose or goal for the process is credible.

27. At the time Merrick purchased the policy he was a successful businessman. Merrick had worked his way through college graduating *cum laude* from the University of Tulsa.  After graduating from college he enrolled in the Stanford MBA program.  During the time he was in that program he worked for General Mills.  After graduating from the Stanford program Merrick went to work for General Foods ultimately becoming a vice-president of marketing and sales. After working for General Foods Merrick became the CEO of Mueller Pasta, the largest pasta manufacturer in the United States.  He successfully led a management buy out of the company when First Boston purchased it for $425 million.

28. Merrick's experience with the Mueller Pasta buy-out led him to become a partner in a venture capital firm.  The firm specialized in consumer products.  Among the more successful investments the firm made that Merrick was responsible for was Boston Beer Company, the producer of Sam Adams beer.

29. At all times relevant to this lawsuit, and the claims asserted herein, Merrick's occupation was that of a venture capitalist.  Such an occupation required long hours of work, substantial work related travel, and the ability to read, comprehend, evaluate, and explain, complex financial documents rapidly.  As a venture capitalist Merrick had multiple responsibilities.  These included raising funds to manage, evaluating potential business ventures for investment purposes, investing and monitoring investments, and working with the companies that the venture capital firm was invested on both an operational and strategic levels to position them to go public.  It is through the process of public offerings that much of the profit in venture capital is attained.

30. In 1991 Merrick began suffering from a chronic low grade illness.  By 1993 it had begun to substantially impact his performance in his venture capital firm and he began negotiating his exit from the business because of his inability to perform.

In the end of July, 1994, Merrick wrote to Revere to put it on notice of claim advising it that he was still trying to obtain a definitive diagnosis.

31. Revere receive Merrick's letter on August 2, 1994.  Upon receiving Merrick's notice Revere was required to post a reserve, known as an incurred but not reported reserve, IBNR.

32. Given that Merrick's benefits under his policy were $12,000 per month, that Merrick was fifty-one years old when he provided notice of claim, and that if totally disabled he would be entitled to benefits until age 65, the IBNR reserve was substantial.

33. Between, July of 1994 and February, 1995 Merrick continued to seek a definitive diagnosis and treatment for his illness and in December 1994, after undergoing physical, psychiatric and neuropsychological testing at the Mayo Clinic he was diagnosed with Chronic Fatigue Syndrome.

34. Merrick then filed all claim forms required of him and Revere, recognizing that Merrick could no longer perform the material and substantial duties of his occupation as a venture capitalist, put him on claim without a reservation of rights.

35. Before deciding to put Merrick on claim, Revere first considered whether it could reclassify Merrick's occupation as that of an unemployed person.  Ex. 174 at 188. If so, it would have denied his claim, on the basis that he was capable performing the material and substantial duties of an unemployed person, *e.g.*, activities of daily living.[17]  Two of Defendants' witnesses, Ms. Bostek and Mr. DiLisio attempted to justify the unemployed-as-an-occupation analysis, but the Court need not credit their explanations.  Ms. Bostek admitted that if Revere had been

---

[17] One court has described these Defendants' conduct in classifying individuals' occupations as unemployed as "'pure poppycock' utterly bereft either of textual support in the language of the insurance contract or the gloss place on such language by any Arizona [the relevant jurisdiction] case."  *Norcia v. Equitable Life Assurance Society of the United States,* 80 F.Supp.2d 1047, 1053 (D.Ariz. 2000).

able to assert that Merrick, despite his years of employment as a venture capitalist, was unemployed at the time disability arose, it would have denied the claim.  Mr. DiLisio, attempted to justify the unemployed as an occupation tactic as a means to extend benefits.  His explanation was so qualified and convoluted it was not credible.

36. During the time that Merrick was seeking to obtain a definitive diagnosis and treatment, Defendant Revere repeatedly sought information on whether Merrick intended to file a formal claim for benefits.  While Defendants sought to characterize this evidence as attempts to be of service to Merrick, another interpretation is more likely – if Merrick told Revere that he was not filing a claim, the IBNR could be released, and money that Revere had to reserve to pay Merrick's claim could be removed from its liabilities and added to its assets.

37. Merrick remained on claim.  Internal evaluations of his claim by Revere's medical personnel concurred in his treating physicians' conclusions that Merrick was substantially impaired.

38. On August 2, 1995, through its field investigator Michael Kunkin, Revere offered Merrick four months of benefits if he would give up his claim.  If he had accepted the offer Merrick would have relinquished over $1.5 million in benefits.  At the conclusion of the visit, Kunkin left Merrick a check for $12,000 representing one month of benefits with an endorsement on the back constituting an agreement that some kind of settlement had been reached regarding all liability under the claim. (Ex. 174, at 222.)

39. Defendants attempted to characterize this settlement offer as a "return to work benefit."  No credible evidence suggests this was the case.  Revere had not established that Merrick could go back to work as a venture capitalist.  It had not identified any venture capitalist position that Merrick could work in with reduced stress and on a part-time basis as recommended by his treating physicians.

Defendants further admitted that they had not offered Merrick any rehabilitation assistance or services.

40. At the meeting where the field investigator offered the claim settlement, he left Merrick with the impression that if he did not take it, the company might sue him for the benefits it had previously paid.

41. Further supporting the view that Defendants were engaged in a low-ball settlement attempt is found in corporate documents.  According to the Provident/Paul Revere Transition Plan, Ex. 113, field settlements of greater than three months of benefits were to be made only in turn for a signed release, meaning a completely final payment.[18]

42. The Court concludes, as did Merrick, that Revere, in fact, was attempting to obtain a settlement based on a low ball offer and a threat to engage in litigation.

43. After Merrick turned down Revere's settlement offer it required that he attend a neurologic IME as part of its claims investigation.  That IME took place on November 20, 1995.  That neurologist, Dr. Donaldson also concluded that Merrick was substantially impaired, though he disagreed with the diagnosis from Merrick's treating physicians that Merrick suffered from Chronic Fatigue Syndrome.  While Revere claimed there were some questions raised as to Dr. Donaldson's opinion regarding the extent of Merrick's impairment, Revere never sought to clarify its concerns.

44. On January 29, 1996, Paul Revere advised Merrick that any further payments would be made pursuant to a reservation of rights based on Dr. Donaldson's

---

[18] Ex. 113 at 303:

> [W]e recommend allowing Field Claim Representatives up to six months in benefits, to be used at their discretion for settlements.  In general, however, settlements greater than three months would be expected to be in exchange of a signed release.  Otherwise, it must be questioned whether or not this advanced payment makes sense in terms of being a completely final payment.  Advance payments for the sake of closure only, with a significant expectation of reopening, would not be proper.

conclusions that there was no objective evidence supporting Merrick's claim that he was disabled by Chronic Fatigue Syndrome or Lyme Disease.  Ex. 174 at 279.

45. While Merrick had previously had a large income and benefits from his occupation as a venture capitalist such income did not insulate him from financial stress.  Money that had been saved for other purposes was used to meet regular expenses.  In addition to his immediate family, Merrick was providing support for his aged father, who was essentially indigent and his adult daughter who had terminal breast cancer.  Merrick, along with others, was also providing support to Young Mee Jeon, who would eventually become his wife after his divorce.  At the time she was attending a seminary.[19]

46. As a result of his illness and consequent loss of income, Merrick was attempting to scale back his expenses.  His family began the process of selling his house in Connecticut.

47. By paying under reservation Revere substantially impacted Merrick's peace of mind because he no longer felt assured of his monthly finances.  Similarly, the threat of litigation substantially eroded the "peace of mind" that disability insurers know they are selling when they market their products.[20]

48. In November 1996, all the medical evidence in the file supported the fact that Merrick was disabled from his own occupation.  Defendant's in-house evaluators concurred with Merrick's doctors on the issue of impairment, though they disagreed on diagnosis.  Defendants' in-house evaluators knew that the lack of objective test results was not definitive with respect to whether Merrick suffered

---

[19] Defendants assert Merrick was engaged in a cross-country affair with Young Mee Merrick prior to his divorce.  That assertion was unsupported by any evidence at the second trial.  Merrick testified without dispute that he and his current wife only became intimate after he was divorced, a divorce initiated by his ex-wife.

[20] *See, e.g., Egan v. Mutual of Omaha Life Ins. Co.*, 598 P.2d 452, 456, *modified on rehearing*, 622 P.2d 141 (Cal. 1979).

from Chronic Fatigue Syndrome.  They knew that neuropsychological testing could not be used to diagnose the disorder.  Ex. 174 at 343.  *See also*, Ex. 348.[21]

49. In November 1996, after the Provident "Best Practices" training, Revere's investigator, Kunkin, returned to Merrick's house in Connecticut.  Merrick's son had recently died, a fact the company was aware of.  Ex. 174 at 486-488.

50. Despite the uniformity of opinion that Merrick was in fact disabled, in November 1996, after receiving Provident's training on claim objectification, Kunkin, as directed, represented to Merrick that all of Revere's medical reviewers had determined that he was not disabled.  Ex. 174 at 512.  Kunkin offered Merrick two months of benefits in exchange for Merrick's agreement not to pursue further benefits.  Ex. 174 at 508, 510.  Kunkin told Merrick that if he did not accept this offer the company might sue him for benefits it had previously paid.  When Merrick rejected this offer, Defendants terminated his claim.

51. Along with the financial stress, the death of Merrick's son made him particularly vulnerable to harm caused by Defendants when they terminated his benefits.  It would be hard to conceive of a more vulnerable individual than a disabled parent, who had recently suffered the death of a child.

---

[21] Confirming the information in the file that neuropsychological testing could not be relied upon as a basis to deny the claim, this November 1997 internal memo authored by Defendants states in relevant part:

On November 7, 1997 the following people met to discuss our handling the FMS and CFS claims. …

Our goal was to discuss these two illnesses, evaluate where we are in handling them and develop and action plan to move forward.

Basically we have acknowledged the credibility of these diagnoses based on considerable research by high profile organizations.  … We realize that there are no clinical tests to objectify the diagnosis of CFS and FMS yet there are board certified physicians certifying to partial and total disability. We know there is no cure, no true treatments and no objective way to refute the diagnosis.

52. At the time of the second field visit by Kunkin in November, 2006, Merrick's claim was targeted for closure on a rush basis.  Ex. 174 at 508.  Defendants had no legitimate basis to terminate Merrick's claim in November, 1996.  Closing his claim at that point served only Defendants' financial interest in removing a substantial liability from their books as they approached the year end, thus making it more likely that they would meet their net termination ratio and financial goals for that quarter.

53. In November 1996 Revere closed Merrick's claim supporting its denial on the basis of a lack of objective evidence, though such was not a requirement of the policy and despite its knowledge that CFS could not be diagnosed or measured through such testing.  Ex. 174 at 343, 525, Ex. 348.

54. After Revere terminated Merrick's benefits, he attempted on repeated occasions to get his claim paid.

55. Merrick specifically asked Defendants what testing they would consider sufficient to support the claim.  Ex. 174 at 542-543.  Defendants refused to provide Merrick with that information.  *Id.*  They concealed from Merrick what they in fact knew— that there was no objective testing to measure the impairment or establish the diagnosis.

56. Each time Merrick submitted new information in support of his claim Defendants rejected it.  On each occasion they asserted that the absence of objective medical evidence precluded claim payment.  Ex. 174 at 539, 611.

57. Defendants' knew that Merrick's illness could not be established by objective evidence, but repeatedly insisted he produce such evidence, when their contract did not permit them to do so.  Ex. 174 at 518, 525, 539, 536, 611.

58. Defendants, shifted the burden of investigation to their insured, refusing to assist him in getting his claim paid, despite their obligation to do so.

59. Merrick persisted in attempting to get his claim paid without litigation until April 2000.

60. At the first trial the jury determined that each Defendant had breached the insurance contract.  This finding was affirmed on appeal.

61. At the first trial the jury determined that each Defendant had not had a reasonable basis to terminate Merrick's benefits or had otherwise acted unreasonably in connection with the claim.  This finding was affirmed on appeal.

62. At the first trial the jury determined that each Defendants unreasonable claims handling behavior had been engaged in knowingly or recklessly. This finding was affirmed on appeal.

63. At the first trial the jury determined that each Defendant had acted in bad faith. This finding was affirmed on appeal.

64. At the first trial the jury determined that each Defendant had acted with oppression, fraud or malice.  This finding was affirmed on appeal.

65. At the first trial the jury determined that Merrick suffered emotional distress as a result of Defendants' bad faith conduct and compensated him in the amount of $500,000 for which Defendants were jointly and severally liable.

66. At the first trial the jury determined that Defendants breach of contract had deprived Merrick of $1,147,355 in contract benefits for which Defendants were jointly and severally liable.

67. After the first trial Defendants started paying Merrick contract benefits, again subject to a reservation of rights.

68. As a measure of damage for loss of use and delay for accrued damages, Defendants paid prejudgment interest of $550,173.69.

69. Defendants' paid recoverable costs of $19,214.54.

70. Defendants' paid $171,646.66 in post-judgment interest on the compensatory damages.

71. Under the post-trial reservation of rights Defendants paid Merrick an additional $486,799 in contract benefits.

72. The total actual and potential loss to Merrick as a result of Defendants' bad faith conduct, including liability for breach of contract in terms of money paid by Defendants was $2,875,186.89.  When the first judgment is brought current to the date of verdict in the second trial, it had a present value of $2,445,952.71. Combined with the post-first-trial benefits, the total harm actual and expected to Merrick as of the date of the second verdict was $2,932,751.71.

### D.   Merrick's Claim Was Handled In Accordance With Defendants' Corporate Scheme

That Defendants handled Merrick's claim in accordance with their corporate scheme is established throughout the evidence including:

73. Attempting to classify Merrick's occupation as "unemployed" in an effort to deny him benefits.  Ex. 174 at 186; Ex. 347.

74. Asserting a reservation of rights on claim payments without a basis for doing so. Ex. 174 at 279, Ex. 325 at 19, Ex. 326 at 12; Ex. 327 at 5.

75. Twice attempting to force Merrick into accepting a low ball offer of settlement in turn for a complete release of his claim or face the possibility of being sued for benefits previously paid.  Ex. 174 at 279; Ex. 325 at 12, 19; Ex. 326 at 12, Ex. 327 at 5.

76. Disregarding or cherry-picking inconsistencies in medical records to create a pretext for claim termination, despite the uniformity of opinion from treating physicians and evaluators that Merrick was substantially impaired.  Ex. 174 at 70, 153, 177; Ex. 235 at 10-11; Ex. 327 at 2.

77. Not considering Merrick's condition or medical records as a whole, as reflected in Defendants' selective reliance on portions of the Mayo Clinic's evaluation of Merrick while ignoring the overall conclusion which was that Merrick in fact had Chronic Fatigue Syndrome;

78. Misrepresenting to Merrick that Defendants' own in-house evaluators had determined that he was not substantially impaired, when, in fact, they concluded he was.  Ex. 174 at 518, 519, 522-524, 525; Ex. 326 at 12, Ex. 327 at 3.

79. Telling Merrick that his claim had to be denied because it was not supported by objective evidence when there was no such requirement for claim payment in the policy and Defendants' knew that objective testing was not likely to show impairment.  Ex. 174 at 343, 525, 536, 539, 611, Ex. 235 at 8; Ex. 326 at 9; Ex. 327 at 3; Ex. 348.

80. Telling Merrick that he was not disabled under the policy from his own occupation despite not having conducted any sort of investigation to establish that the occupation of venture capitalist could be performed on a part time basis in a low stress environment.

81. Closing Merrick's claim on a rush basis in order to meet quarter end financial goals, though Defendants had no evidence within their possession to support such a claims decision on the merits.  Ex. 174 at 508; Ex. 326 at 11; Ex. 327 at 3.

82. Shifting the burden of claim investigation to Merrick to come up with evidence satisfactory to Defendants and then refusing to provide him any assistance with respect to carrying that improperly imposed evidentiary burden.  Ex. 174 at 519, Ex. 235 at 8, Ex. 326 at 11; Ex. 327 at 5.

83. Requiring Merrick to file suit, incur attorney fees and costs, and to go through litigation in order to obtain the benefits to which he was entitled.  Ex. 326 at 12; Ex. 327 at 5.

84. Further, it is not unreasonable to conclude that Merrick's claim was subjected to a round table which was not documented.  Merrick's claim involved a high indemnity own occupation policy.  Merrick's claim involved a "subjective disability."  While Merrick's claim was not new when the round tables were brought to Revere, it was closed and he was seeking to have it reopened by providing additional information.  Under Defendants' "Best Practices Recommendations" which were implemented with the Provident/Revere merger there is every reason to believe that Merrick's claim was "roundtabled."  Ex. 113 at 262.

All of the facts described above warrant this Court finding that Defendants conduct requires an award of substantial punitive damages to accomplish the dual purposes of punishment and deterrence. Other facts described below support this finding further.

**E.     Defendants Are Unrepentant With Respect To The Conduct They Directed At Merrick Or With Respect To Their Corporate Scheme**

In the prior trial of the case the jury found that each Defendant had breached the insurance contract in bad faith. The jury found that each Defendant had acted with oppression, fraud or malice. These findings were affirmed on appeal. Despite these jury determinations and judicial findings at the retrial Defendants:

85. Asserted that they had done nothing wrong in the handling of Merrick's claim;

86. Repeatedly insinuated that Plaintiff was not disabled.

87. Asserted that the company(s) had never done anything wrong in handling any claims.

   a. Defendants claimed that insurance regulators had found that they had not engaged in any form of misconduct towards any insured. This position was demonstrably wrong and Defendants knew it. The evidence established that investigators found widespread misconduct in Defendants' claims handling and that Defendants chose to enter into settlement agreements with regulators in order to avoid the formal findings of the very misconduct that they denied. The evidence also established that they entered into these settlements to avoid additional financial and regulatory repercussions from their misconduct. Ex. 235; 286; 327.

   b. Presented expert testimony concerning the regulatory process with respect to these Defendants' which was simply not credible for several reasons. Defendants' regulatory expert, Mr. Poolman, had no first-hand knowledge of the regulatory process as applied to these Defendants. Mr. Poolman admitted that he did not participate in the process, did not know

what documents, if any, beyond claim files, that examiners had access to, admitted that he had not even read most of the documents Defendants provided to him, and was seemingly unaware of other regulatory actions taken against Defendants by both the State of California and the State of Georgia.  Even Mr. Poolman's testimony concerning the Multistate regulatory process and how it was settled, the testimony which he was retained to provide, lacked credibility.  Only a heavily biased or truly uninformed witness could conclude that Defendants were given a clean bill of health by regulators and that they had not systematically engaged in the denial of valid claims of their disabled insureds.

c.  Put on testimony of a witness, Kristine Bostek, who testified as to the good practices at the company, but who also admitted to being less than forthcoming in prior testimony, and who was less than forthcoming in her own testimony at trial as revealed by her denial of knowledge and impeachment over the Columbo award — an award Defendants gave to claim handling employees whose investigations led to the termination of claims.

d.  Failed to present the testimony of a single current claims handling or management level employee who could testify as to current practices at the company or could testify that any of the types of bad faith conduct evidenced in Merrick's claim file and in the institutional documents had changed.

e.  Moreover any suggestion that things are different at the company now was belied by evidence that certain regulatory settlements precluded Defendants from being cited for regulatory violations during the claim reassessment process, Ex. 346, and the fact that the high level management of Defendants which knew and participated in the institutional bad faith practices at Defendants remain in place.  For

example Thomas Watjen, who was with Provident at the inception of

Defendants' bad faith conduct, and who was the head of its finance

investment and legal organization at the time of the merger with Revere,

Ex. 188 at MERG 0047-48, was Vice-Chairman of Executive Management

after the merger with Revere, *id.* at MERG 0096, remains as the CEO of

Unum Group.  Ex. 342 at 20, See also, Ex. 286, 281, 188 at MERG 0089.

**F.  Defendants Refuse To Accept Responsibility For Their Misconduct And Sought To Hide Their Misconduct Through Claims Of Privilege And Document Destruction**

Just as Defendants remain unrepentant, the evidence at trial established that in

seeking to avoid liability for punitive damages they were willing to manufacture a

defense designed to hide their misconduct as well as establishing corporate practices to

hide their misconduct on an ongoing basis.  The evidence which supports these factual

conclusions includes:

88. Presenting statistical claims about corporate practices based not on statistics

generated in the regular course of business, but, rather, based on statistics

generated at the request of their trial counsel.  O'Connell Testimony.

89. Presenting false testimony that they were returning their claimants to work when

they had no idea whether claimants who they classified as "return to work"

actually had done so.  Testimony of  Kathy Rutledge (rebuttal testimony)

90. Claiming that a large number of resolutions were due to people returning to work

or as a result of company rehabilitation efforts when the evidence revealed that

at best, an insignificant portion of claimants benefited from Defendants' return to

work/rehabilitation activities.  In many of the corporate documents admitted at

trial dealing with claim resolutions, return to work/rehabilitation is not even

mentioned.  Where mentioned and quantified, the statistics revealed it was of

little import to the overall claim resolution process.

91. Claiming that their corporate policies were the result of consultants that they had hired, when the evidence showed that they were already doing most of those things the consultants recommended.  Ex. 46.

92. Having corporate policies designed to hide claim handling activities through claims of attorney client privilege; Ex.6; Ex. 99.

93. Having corporate policies designed to hide claim handling activities by either not creating or destroying documents material to the claims handling process.  Ex. 113; Ex. 325 at 20; Ex. 326 at 11; Ex. 327 at 4.

94. As further evidence that Defendants refuse to accept responsibility for their own conduct was their attempt, through their expert Robert DiLisio, to suggest that Defendants' conduct was not bad, because other companies engaged in like behaviors and practices.  While the credibility of this testimony was challenged, even if accepted it would not ameliorate to any significant degree the punitive damages that are needed.  Rather, as discussed below, such testimony if true supports the need for a higher award of punitive damages to accomplish the deterrent purpose of such awards.

## III.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

The parties generally agree on the analysis that this Court must conduct of the punitive damage awards at issue.  The Court must consider the reprehensibility of Defendants' conduct, including considering ameliorative facts, the ratio between the punitive damages awarded and the harm and potential harm suffered by the Plaintiff and a comparison between the punitive damages awarded and any potential penalties which were applicable to the conduct at issue.  *BMW of North America v. Gore*, 517 U.S. 559, 575-585 (1996).

These standards have been address subsequently by the Supreme Court in *State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U.S. 408 (2003), and several decisions of the Ninth Circuit which control this Court's discretion.  Much of this federal punitive damage constitutional analysis is set forth in the Ninth Circuit's decision in *In re*

*Exxon Shipping*, 490 F.3d 1066 (9th Cir. 2007), *reversed on other grounds*, *Exxon Shipping Co. v. Baker,* 554 U.S. ___, 128 S.Ct. 2605 (2008).  Of the three factors identified in *BMW v. Gore*, reprehensibility is the most important one in determining whether a punitive award is constitutionally excessive.  *State Farm v. Campbell,* 538 U.S. at 419.  Because reprehensibility is the most important factor, the Court starts its analysis with assessing the reprehensibility of Defendants' conduct in this case.

### A.   The Defendants' Engaged In Highly Reprehensible Conduct

The Court has rarely if ever seen a case where the conduct of the Defendants was as reprehensible as the conduct of the Defendants in this case with respect to both Mr. Merrick and their other disabled insureds.  Were this Court's discretion not constrained by the binding authority of Supreme Court precedent and that of the Ninth Circuit, it would grant no relief to Defendants.  *State Farm v. Campbell's* reprehensibility analysis focused on five factors:

> whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

538 U.S. at 419.  Subsequently, In *Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605, 2622 (2008), the Court recognized that misconduct engaged in to obtain financial gain or augment profit was highly culpable deserving greater punishment.

### 1.   Defendants Engaged In Misconduct To Augment Profits

In this case, all of Defendants' misconduct, both that directed at Merrick and at their disabled insureds at large, as described in §§ II A-D warrants the conclusion that Defendants engaged in the conduct at issue in this case to augment their profits and to obtain improper financial gains.  The evidence also establishes that such conduct was successful and that Defendants have reaped hundreds of millions of dollars if not more in benefit from engaging in the conduct.  § II.B.  No award that his Court can make will force Defendants to disgorge all the improper profits that they obtained.  As described

below, these profits were obtained at the expense of physically, mentally, emotionally, and economically vulnerable individuals, through repeated actions systematically applied to deprive them of disability insurance benefits in their time of need. Defendants have engaged in such conduct both with respect to Merrick and to their other insureds for an extended period of time.  Such conduct leads to the conclusion that these Defendants engaged in highly reprehensible conduct.

### 2.    Defendants' Conduct Caused More Than Economic Harm

Both the Supreme Court in *BMW* and the Ninth Circuit in *Exxon* and other cases have recognized that conduct which causes emotional as well as economic harm is more reprehensible than that which causes only economic harm. *BMW v. Gore*, 517 U.S. at 576, n. 24; *In re Exxon Valdez*, 490 F.3d at 1085-86.  In *State Farm v. Campbell*, after remand, the Utah Supreme Court finding that insurance bad faith and the emotional distress it causes is more akin to a physical assault than a pure economic tort and remitted the punitive damages to a 9:1 ratio.  The Supreme Court then denied further review.  *State Farm Mutual Automobile Ins. Co. v. Campbell*, 2004 UT 34, 98 P.3d 409, 415 (Utah 2004), *cert. denied*, __ U.S. __, 125 S.Ct. 114 (2004).  Nevada law also recognizes that the tort of insurance bad faith goes beyond a mere economic offense because it deprives the insured of the bargained for consideration, peace of mind. *Ainsworth v. Combined Ins. Co.,* 763 P.2d at 673, 677, *cert. denied,* 493 U.S. 958 (1989).

Merrick in fact suffered substantial emotional distress and there is no reason to doubt that other insureds, subjected to the same misconduct also suffered significant emotional distress.  This Court may certainly consider such harm to others in determining the reprehensibility of Defendants conduct.  *In re Exxon*, 490 F.3d at 1087.

### 3.    Defendants Conduct Risked the Health and Safety of Merrick and Others

Virtually any disabled individual is at risk of harm to their health and safety if a disability insurance carrier deprives them of their benefits.  Such contracts are entered into for the purpose of protecting peace of mind, as well as financial assets, in times of

need. *Egan v. Mutual of Omaha Life Ins. Co.*, 598 P.2d 452, 456, *modified on rehearing*, 622 P.2d 411 (Cal. 1979), *accord*, *Ainsworth*, *supra* (health insurance). The type of risks to health and safety that insureds may suffer when their benefits are cut off is described in some detail in the district court's opinion in *Hangarter v. Paul Revere Life Ins. Co.*, 236 F.Supp.2d 1069, 1096-97 N.D. Cal. 2002), *affirmed in part, reversed in part* 373 F.3d 998 (9th Cir. 2004).

Merrick himself was similarly at risk. At the time of Defendants' second visit to Merrick his teenaged son had recently died. Merrick's adult daughter had terminal cancer and he was supporting her economically. He was supporting his father. At a time of high emotional vulnerability Defendants' attempted to settle Merrick's claim for two months of payments and a threat of litigation. When he refused their low-ball settlement offer, Defendants terminated benefits adding to his emotional stress. While Merrick had financial resources that he could turn to, the need to use funds otherwise committed for day to day expenses was stressful.

### 4.    Defendants Targeted The Financially Vulnerable

All of the evidence discussed in §§ II.A-B *supra* suggests that Defendants targeted their financially vulnerable insureds. Exhibits 44 and 75 demonstrate that Defendants' targeted individuals such as Merrick in part because their illnesses often left them vulnerable to pressure that Defendants could bring to bear upon them to "achieve some type of resolution." That Defendants sought to take advantage of this is reflected in their unsuccessful efforts to settle Merrick's claims for minimal amounts while threatening litigation to obtain previous payments. §§ II.A, C, D.

While Merrick himself was not left destitute he too felt financial stress when he became disabled and then when Defendants terminated his benefits. As a result of his disability he had left his occupation and was forced to scale back his standard of living. Faced with the denial of benefits, he reached into savings and investments for which he had other purposes, to meet current obligations such as supporting his own father, his terminally ill daughter, and to aid in the support, along with others, of Young Mee Jeong, who would later become his wife. § II.C.

*In re Exxon* again teaches that when assessing reprehensibility the Court can also consider the risk of harm to others when the conduct at issue was putting them at risk too.  There is little doubt that Defendants' conduct directed at others was directed at the financially vulnerable.  Again, a taste of that vulnerability is reflected in the district court's opinion in *Hangarter*, *supra.*  Some lose their homes, some are forced on to welfare, some are forced into bankruptcy.  That these consequences did not happen to Merrick is a matter of fortuity and not the result of Defendants taking steps to avoid harming their disabled insureds.

### 5.    Repeated Action

Just as there is no doubt that Defendants engaged in their misconduct for financial gain, there is absolutely no doubt that they repeatedly engaged in misconduct with respect to both Merrick and their other insureds.  §§ II.A-D.

The testimony and exhibits concerning Defendants use of "unemployed" as an occupation left no doubt that it was a technique repeatedly employed to defeat claims regardless of its lack of contractual or legal merit.

Defendants repeatedly engaged in misconduct towards Merrick through such means as the low-ball settlement offers with threats of litigation, asserting reservations of rights and maintaining them without good cause, misrepresenting that medical reviewers had not found impairment, when they actually had, repeatedly misrepresenting that objective evidence was required to obtain claim payment, when it was not a requirement of the policy and Defendants knew it could not exist in light Merrick's illness, refusing to assist Merrick in getting his claim paid, shifting the burden of investigation to Merrick, and closing his claim without cause on a rush basis to meet monthly, quarterly and/or year-end goals.

Further, the evidence discussed in §§ II.A, B, D further establishes that the conduct directed towards Merrick was not the result of accident or inadvertence, but was part of a widespread corporate plan or scheme to augment profits through wrongful conducted targeted at disabled policyholders.  Defendants' claims and testimony that there was no such corporate plan were simply not credible in light of the overwhelming

documentary evidence establishing that such existed and was transmitted through all levels of the company from claims handlers to board room.

Based on the evidence introduced at trial and taking into account matters of credibility, the only conclusion to be drawn is that Defendants engaged in a widespread corporate plan, and conscious course of corporate conduct firmly grounded in established company policy, to disregard Merrick's rights and the rights of tens of thousands, if not hundreds of thousands of other policyholders.  Defendants' misconduct indeed involved repeated action.  The length of time and thousands of individuals against whom Defendants improperly acted adds additional weight to the conclusion that Defendants' misconduct reaches the highest levels of reprehensibility.

### 6. Defendants Acted With Malice, Trickery Or Deceit And Not By Accident

Based on the evidence discussed at §§ II.A-B, there is no doubt that Defendants acted consciously and deliberately and not by accident when they established and then drove their new claim handling philosophy deep into their corporate culture.  Ex. 95.

With respect to Merrick's claim, which was handled in accord with Defendants' corporate scheme the evidence discussed in §§ II.C and D, clearly establishes that Defendants acted maliciously, attempted to trick Merrick into giving up his claim for a minimum settlements and acted deceitfully through intentional misrepresentation. Defendants deliberately misrepresented what their own evaluators concluded and knew in their attempt to attain a settlement of the claim.  Defendants threatened Merrick with litigation if he did not give up his claim, Defendants misrepresented repeatedly that he needed to provide objective evidence to get his claim paid.  Defendants made these misrepresentations knowing that such evidence did not exist with respect to Merrick's disability.  Despite knowing that it was their burden to fairly investigate claims, Defendants put the burden of claims investigation on their disabled insureds, including Merrick, and then refused to assist him when he sought assistance from them in order to fulfill the improperly shifted investigatory burden.

The credible evidence introduced at trial, clearly establishes that Defendants acted intentionally and maliciously both with respect to the establishment of bad faith claims practices in general, and with respect to Merrick's claim in particular.  That Defendants' conduct has not resulted in criminal prosecution can only be attributed to either a lack of prosecutorial resources, or inadequacies in the criminal law.  This factor also militates in favor of high reprehensibility.

As the Ninth Circuit noted in *Exxon,* the *BMW/Campbell* guideposts should not become an intellectual straight jacket.  490 F.3d at 1083.  The parties recognize this and both Defendants and Plaintiff argue additional facts in support of their respective positions.  The Court agrees with those positions asserted by Plaintiff and disagrees with those asserted by Defendants.

Defendants' lack of repentance, refusal to acknowledge responsibility, attempts to hide their misconduct from discovery, presentation of false and misleading evidence to the jury all suggest a need for greater punishment and deterrence and add to the sense that Defendants conduct is highly reprehensible.

Similarly, it appears that prior punitive damage awards have been insufficient to either punish or deter.  Considering what they have gained as reflected in § II.B, it is little wonder.  The prior awards have not been enough to "sting" the Defendants in light of what they have gained.  Even now the award against Revere is less than 2.4% of its net worth and that against UnumProvident is 0.45% of its net wealth.  These awards are hardly enough to accomplish punishment and deterrence in light of the financial wherewithal of the Defendants.

Defendants attempts to justify their conduct through their expert Robert DiLisio, by suggesting that all companies do what the evidence shows these Defendants did, does not, in the Court's view ameliorate the reprehensibility of the misconduct.  If anything such evidence tends to suggest that a strong message needs to be sent to validate Nevada's interest in both punishing these Defendants and deterring them and others from acting in the same way in the future.

1    Against these other factors Defendants posit that their payment of Merrick's claim

2    prior to merger and after accepting liability without reservation should be counted in

3    their favor.  It is not, such conduct was a contractual obligation.  Defendants' second

4    claim that they paid benefits after terminating Merrick's claim is true.  But the Court

5    rejects Defendants claim of innocent and good faith motive.  Defendants at the time

6    they agreed to extend benefits for two months had already breached the contract, had

7    already lied to Merrick about what medical reviewers found, what evidence was required

8    to obtain claim payment and had already shifted the burden of investigation to Merrick,

9    a burden they knew he could not meet.  In light of these facts, the Court agrees with

10   Plaintiff that the later payment of benefits was simply a tactical move by Defendants to

11   obscure their misconduct.  Lastly, the Court rejects the Defendants assertion that their

12   position was "hardly arbitrary" and therefore reflected lower reprehensibility.  The Court

13   agrees the conduct was hardly arbitrary, but not in the way the Defendants would

14   prefer.  The evidence clearly established that Defendants misconduct directed towards

15   Merrick was intentional and deliberate.  Defendants' misconduct was not just the result

16   of arbitrary action, but, in the Court's view, taking into consideration all the evidence and

17   the credibility of the witnesses, intentional misconduct aimed at obtaining financial gain

18   at the expense of their disabled insured.  Such conduct was and is highly reprehensible.

19                     **7.   Reprehensibility Conclusion**

20          Based on the Court's reprehensibility analysis it concludes that the Defendants'

21   intentionally engaged in misconduct towards Merrick and thousands of others for their

22   own financial gain.  The Court further concludes that Defendants deliberately targeted

23   those who were physically, mentally, emotionally, and financially vulnerable.  The Court

24   concludes Defendants repeatedly subjected Merrick and thousands of others to their

25   bad practices and subjected hundreds of thousands to the risk of those bad practices.

26   Finally, the Court concludes that Defendants acted maliciously with trickery and deceit

27   towards Merrick and thousands of others of their insureds and again subjected

28   hundreds of thousands of insureds to the risk of their misconduct.  Defendants did not

act by accident.  The Court concludes that the reprehensibility of Defendants conduct

requires punishment at the highest levels constitutionally permissible.

**B.    Ratio**

The Court's ratio analysis will be governed by the analytic "rough framework" laid

out by the Ninth Circuit in the *Exxon* case.

> In *Planned Parenthood,* we used this guidance from *State Farm* to
> construct a "rough framework" for determining the appropriate ratio
> of punitive damages to harm. *See* 422 F.3d at 962. We held that in
> cases where there are "significant economic damages" but behavior
> is not "particularly egregious," a ratio of up to 4 to 1 "serves as a
> good proxy for the limits of constitutionality." *Id.* (citing *State Farm,*
> 538 U.S. at 425, 123 S.Ct. 1513). In cases with significant
> economic damages and "more egregious behavior," however, a
> single-digit ratio higher than 4 to 1 "might be constitutional." *Id.*
> (citing *Zhang,* 339 F.3d at 1043-44;*Bains,* 405 F.3d at 776-77).
> Finally, in cases where there are "insignificant" economic damages
> and the behavior is "particularly egregious," we said that "the single-
> digit ratio may not be a good proxy for constitutionality." *Id.*

490 F.3d at 1093.  This case clearly falls within the second tier of that framework.

Merrick clearly suffered significant economic loss and Defendants' conduct was highly

reprehensible.  Defendants claim that the ratio should be reduced because of their prior

payments to Plaintiff and the regulatory settlements.  The Court disagrees that these

require any reduction, with respect to Revere, or any substantial reduction, not

otherwise given under the Ninth Circuit's framework, with respect to UnumProvident.

Defendants' prior payments of what they owed were made only after they were found

liable for bad faith.  Defendants' payments after the first trial were made pursuant to

reservation of rights, a reservation which was not removed even after the Ninth Circuit

affirmed the breach of contract and bad faith findings, and the findings that Defendants

acted with oppression, fraud or malice.  Defendants' payment of the underlying

judgment does not ameliorate their misconduct.  They had no basis not to pay.

Defendants remain unrepentant and continue to refuse to accept responsibility for their

misconduct.  They get no credit for their prior payments.

The Regulatory Settlement Agreements are also entitled to little credit in terms of reducing the permissible ratio. Defendants entered such settlements for their own financially motivated reasons. Defendants as reflected in the testimony they offered at trial continue to deny any wrongdoing. As Defendants have never acknowledged or taken responsibility for their misconduct, skepticism is appropriate.

Further, the regulatory settlements did not deprive Defendants of their ill-gotten gains to any substantial degree. Even though Defendants have been forced to post additional reserves to cover those claims that they agreed to reopen, they maintain control of those funds and the earnings they generate from them. Similarly, Defendants have not even attempted to fully compensate those harmed by their misconduct, and, in fact, required individuals who had their claims reopened to waive their rights to full redress. Ex. 350. These facts take something away from the ameliorative impact that the Regulatory Settlement Agreements might have had—as the jury so concluded. Additionally, the finding of no violations on the California reassessment was simply in keeping with the prior settlement and has no particular value with respect to reducing the appropriate ratio. The regulatory settlements therefore have no particular value with respect to punishment. With respect to deterrence, the effects of the changes remain to be seen. What is clear from the trial testimony, the evidence presented, and the evidence not presented,[22] is that Defendants have a long way to go before there is no need for the deterrent effect of punitive damages in this case.

The conduct of Defendants is highly reprehensible without substantial ameliorative behavior on their part. It was engaged in for profit and targeted thousands of vulnerable individuals and put hundreds of thousands at risk. It was repeated, and involves malice, trickery and deceit and is not the product of accident. Under these circumstances a punitive ratio of up to 9:1 is not only appropriate, it is that which is

_____

[22] As noted previously, Defendants did not call a single live witness from the company to address either their prior conduct or their post regulatory investigation changes. This failure to call witnesses occurred despite the fact that they had two corporate representatives who were introduced to the jury present throughout the trial.

1   minimally necessary to meet Nevada's legitimate goals of punishment and deterrence in
2   light of the reprehensibility of the conduct and the wealth of the Defendants.[23]

3          Just as the parties dispute what the appropriate ratio is, they dispute how it
4   should be calculated. The Court agrees with Plaintiff; the ratio needs to be calculated
5   with respect to each Defendant separately. *BMW of North America v. Gore,* 517 U.S. at
6   575; *Bell v. Clackamas County,* 341 F.3d 858, 867-868 (9th Cir. 2003); *Albert H.*
7   *Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 1267-69, 969 P.2d 949, 961-62 (Nev. 1998)
8   (in bad faith case jury made separate punitive damage awards against separate
9   defendants and appellate court engaged in individualized assessment of each such
10  award). Similarly, the Court agrees that because Defendants were jointly and severally
11  liable without apportionment for the underlying harm their conduct caused as found by
12  the prior verdicts and judgments in this case, that it is inappropriate to apportion the
13  harm between the two Defendants. As *Wohlers, supra* demonstrates, that is Nevada
14  law.

15         As to what the denominator should be in the ratio of punitive damages / actual
16  and potential harm, the Court also agrees with Plaintiff. The appropriate denominator
17  consists of the first trial judgment brought to present value to which should be added the
18  post-trial benefits paid to Merrick under reservation of rights. This figure is
19  $2,932,751.71. It is comprised of the prior judgment amount of $2,216, 743.23 brought
20  current to the date of the verdict at 3.3% compounded annually plus the $486,799 in
21  post first trial benefit payments.

22         Using these amounts the ratio as to Paul Revere is $24,000,000 / $2,932,751.71
23  = 8.18:1. Under the facts of this case this ratio is not constitutionally excessive.

24  _____

25  [23] *See State Farm v. Campbell*, 538 U.S. at 427; BMW of North America v. Gore, 517
    U.S. at 591 (Breyer, J. concurring). Here the amounts awarded by the jury are less than
26  0.45% of UnumProvident's net worth, Exhibit 342, and less than 2.4% of Revere's net
    worth. Ex. 341. These percentages of net wealth as a measure of appropriate level of
27  punishment are well within ranges approved by the Nevada Supreme Court and are not
    so punishing as to be constitutionally excessive. *Wohler's v. Bartgis*, 114 Nev. at 1268-
28  1269, 949 P.2d at 962 the Nevada Supreme Court, in reducing punitive awards remitted
    one to an amount that was approximately 6.2% of the defendant's net worth.

As to UnumProvident the ratio is $36,000,000 / $2,932,751.71 = 12.28:1.  Under the facts of this case, but for, the Ninth Circuit's "rough framework" this ratio would not be constitutionally excessive as it does not significantly exceed a single digit ratio and the Defendants conduct, for reasons previously stated is among the most reprehensible the Court has seen or ever wants to see.  It involved misconduct undertaken to augment profit, targeted at the physically, mentally, emotionally, and financially vulnerable.  It involved repeated instances of misconduct deliberately, intentionally, maliciously, engaged in with trickery and deceit.  It involves conduct for which Defendants remain unrepentant and refuse to accept responsibility.  It involves deliberate attempts to hide the misconduct.  Nonetheless, feeling constrained by the Ninth Circuit's "rough framework" it appears that the judgment against UnumProvident must be reduced to a ratio of no more than 9:1.  Scaling back the ratio also gives UnumProvident some credit for the ameliorative impact, if any, of the regulatory settlement agreements and prior payments.

It should be noted that Defendants have not attempted to fully compensate those injured by their conduct and in fact, conditioned payment on the underlying contractual benefits on individuals giving up their right to full compensation.  Exhibit 350.  Similarly, though Defendants have had to post additional reserves, Exhibit 612, they maintain control of those Reserve funds and continue to earn income and profits from them.  In sum, Defendants continue to profit from their improperly obtained gains.

The Court finds the conduct of Revere equally reprehensible to that of UnumProvident.  It does not find that the change in the ratio with respect to UnumProvident causes the Revere ratio to cause grossly disproportionate punishment between the two Defendants.

## C.    Comparable Penalties

The last *BMW/Campbell* factor to address is the matter of civil penalties.  As reflected in the Ninth Circuit's *Exxon* opinion, the Court need not dwell on this factor

because it is of little importance.[24]  Further, what is clear is that the Nevada legislature considers insurance bad faith both a serious matter, and that it recognizes that substantial punitive damages are necessary to punish and deter such conduct.  The legislature specifically chose not to impose statutory caps on punitive damages for insurance bad faith.  NRS 42.005 (2)(b); NRS 42.007(2).  Such an exception, in the face of a prior Nevada Supreme Court case approving punitive damage ratios approaching 30:1, *Ainsworth supra,* suggests that, but for the Ninth Circuit's "rough framework" ratio analysis, the current awards as to both Revere and UnumProvident are constitutionally permissible.

### D.   Miscellaneous Contentions

The Court concludes its decision addressing briefly the other matters raised by Defendants, and addressed by Plaintiff in response.

The Court agrees with Plaintiff that in adopting the BMW/Campbell analysis in *Bongiovi v. Sullivan*, 122 Nev. 556, 138 P.3d 433, 452 (2006), the Nevada Supreme Court did so as a matter of judicial economy.  All the facts which support the constitutional propriety of that verdict and judgment also support the conclusion it is not excessive under Nevada law.  Because the verdict as to Revere falls within the *BMW/Campbell* analysis as interpreted by the Ninth Circuit, that verdict and judgment are not excessive under Nevada law.

With respect to UnumProvident, the Court specifically finds that the verdict and judgment as entered would not be excessive under Nevada law, as the amounts returned in terms of ratio and wealth of the defendant are well within parameters set by the Nevada Supreme Court in *Ainsworth* and *Wohlers*, involving conduct substantially less egregious, and in the case of *Wohlers* substantial voluntary efforts at amelioration and compensation.  Because the verdict and judgment as entered would not violate Nevada law, the remitted amount, if accepted by Plaintiff will not.

---

[24] 490 F.3d at 1094.

Finally, the Court rejects the notion that the Nevada Supreme Court would adopt as a rule of decision the maritime law 1:1 ratio recently announced by the Supreme Court in *Exxon Shipping Co. v. Baker*, 554 U.S. ___, 128 S.Ct. 2605 (2008).  First, the Court expressly stated in its opinion that its decision was not addressing constitutional issues.   Second, the Nevada legislature has expressly rejected ratio or dollar caps on punitive damages in insurance bad faith cases.  In light of this action, the Nevada Supreme Court would not adopt limits more restrictive than those rejected by the legislature.  Finally, the Nevada Supreme Court has previously approved ratios approaching 30:1 in insurance bad faith cases.  Nothing suggests that the Court would not approve such ratios again if constitutionally permissible.

## IV.   CONCLUSION

For the reasons set forth herein, Defendants' motion for New Trial, Remittitur or Reduction of Punitive Damages, Document No. 514 is granted in part and denied in part.  As to Defendant Paul Revere Life Insurance Company the Motion is DENIED.  As to Defendant UnumProvident Corporation the Motion is granted as follows:

The Court hereby orders a remittitur of the punitive damages against UnumProvident to the amount of $26,394,765.39, a ratio of 9:1.  Plaintiff shall inform the Court within 10 days whether he shall accept the remittitur to this amount or not.  If not, the Court shall grant a new trial to defendant UnumProvident.

IT IS SO ORDERED.

DONE this ___ day of _____, 2008.


_____
James C. Mahan
United States District Court Judge